**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **PENSKE TRUCK LEASING CO., L.P.,** | |
| **Plaintiff,** | |
| **v.** | **Case No.** |
| **CENTRAL STATES, SOUTHEAST &** | **Judge** |
| **SOUTHWEST AREAS PENSION PLAN,** | **Magistrate Judge** |
| **and the TRUSTEES OF CENTRAL** | |
| **STATES, SOUTHEAST & SOUTHWEST** | |
| **AREAS PENSION FUND,** | |
| **Defendants.** | |

## VERIFIED COMPLAINT

Plaintiff Penske Truck Leasing Co., L.P., ("Penske" or "Plaintiff") files this Verified Complaint against Defendants Central States, Southeast & Southwest Areas Pension Plan ("Central States" or the "Fund") and the Trustees of the Central States, SE and SE Areas Pension Fund ("Trustees," and, collectively with Central States, the "Defendants"). In support thereof, Plaintiff states as follows:

## INTRODUCTION

Defendants intend to expel Penske's unionized employees in Dallas, Texas from participating in the Fund on November 16, 2021. This expulsion is not permitted by the Trust Agreement governing the Fund and thus violates the Labor Management Relations Act and the Employee Retirement Income Security Act. Expelling Penske's Dallas bargaining unit would also directly and immediately cause Penske to violate the National Labor Relations Act, disrupt the already continuous negotiations between Penske and its union, prevent employees from accruing the pension benefits which they were promised, make it impossible for Penske to

adequately plan its business, and is expected to cost Penske more than $10 million dollars. Penske files this Verified Complaint for declaratory judgment to prevent Defendants' unlawful actions.

## PARTIES

1.     Plaintiff Penske, a Delaware limited partnership, is an employer in or affecting commerce within the meaning of the National Labor Relations Act of 1935, ("NLRA"), 29 U.S.C. § 152(2), and an employer within the meaning of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. § 1001 *et seq*.

2.     Penske is engaged in the full-service truck and trailer leasing, rental and maintenance of over the road trucks and trailers to businesses and the general public throughout North America.  Penske provides these services to customers through a network of over 770 locations that it either owns or leases.

3.     Much of Penske's workforce in the United States is unionized.  It currently has 99 different collective bargaining agreements, including one agreement that covers employees at two of Penske's locations in the greater Dallas, Texas area – one in Dallas, Texas, and one in Duncanville, Texas.   Approximately 46 employees across both Dallas area locations are represented by the General Drivers, Warehousemen and Helpers Local Union No. 745, affiliated with the International Brother of Teamsters (the "Union" or "Local 745").

4.     Defendant Central States is a multiemployer defined benefit pension plan within the meaning of, and subject to, ERISA, and is a labor organization within the meaning of the NLRA, 29 U.S.C. § 152(2).  Central States maintains its principal office and administers the Fund at 8647 West Higgins Road, Chicago, Illinois, in the Northern District of Illinois.

5.     Central States was established in 1955. The Fund provides retirement and related benefits for eligible employees of contributing employers that are signatories to collective

bargaining agreements with Teamsters local unions. Central States is one of the largest multiemployer pension funds in the country. Central States operates on a "plan year" that matches the calendar year (January 1 through December 31). As of the 2020 plan year (the most recent available data), approximately 1,063 different employers contribute to Central States. There are 364,908 participants (both actively employed and retired). Although Central States has approximately $12 billion in assets, it owes approximately $56 billion in vested benefits to its participants. Thus, Central States has approximately $44 billion in unfunded vested benefits. *See* attached **Exhibit A**, Central States Form 5500 (2020).

6.     In 2022 or 2023, Central States is slated to receive billions of dollars of taxpayer funds in a lump sum grant through the Pension Benefit Guaranty Corporation designed to cover all of Central States' unfunded vested benefits that will become due before 2051. This infusion of cash will dramatically reduce Central States' unfunded vested benefits. *See generally*, American Rescue Plan Act of 2021, Pub. L. No. 117-2 (2021); Special Financial Assistance by PBGC, 29 C.F.R. §§ 4000, 4262 (2021).

7.     Central States is governed by its Trust Agreement, as amended through April 1, 2016 ("Trust Agreement"). Like all employers who contribute to Central States, Penske has agreed to be bound by terms of the Trust Agreement. A true and correct copy of the Trust Agreement is attached hereto as **Exhibit B.**

8.     The Trust Agreement requires Employers to submit each new or successive collective bargaining agreement (including memoranda of understanding) to Central States' Contracts Department for review and approval. It further requires that an employer make contributions beyond the expiration of a contract until the Fund receives either:

> a) a collective bargaining agreement signed by both the Employer
> and the Union that eliminates the duty to contribute to the Fund or

> b) written notification that accurately indicates that negotiations with the Union have reached impasse after collective bargaining agreement termination and the Employer has lawfully implemented a proposal to withdraw from the Fund.

*See* **Exhibit B** at Article III, Section. 1.

9.     The Trust Agreement also gives the Trustees the power to reject a collective bargaining agreement or terminate the participation of an "Employer" under certain circumstances:

> The Trustees are authorized to reject any collective bargaining agreement, participation agreement and/or terminate the participation of an Employer (and all contributions from the Employer) whenever they determine that the agreement is unlawful and/or inconsistent with any rules or requirement for participation by Employers in the Fund and/or that the Employer is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund…and/or they determine that continued participation by the Employer is not in the best interest of the Fund. Any such rejection and/or termination by the Trustees of a collective bargaining agreement shall be effective as of the date determined by the Trustees…and shall result in the termination of the Employer and all Employees of the Employer from further participation in the Fund on and after such effective date.

*See* **Exhibit B** at Article IV, Section 20.  This provision is repeated nearly verbatim in Article III, Section 1.

10.     The Trust Agreement defines Employer as "any employer who is bound by this [Trust] Agreement and a) a [CBA or other agreement that requires contributions to the Fund] or b) [an employer who agrees to be bound by this Agreement]."  *See* **Exhibit B** at Article I, Section 1.

11.     The Trust Agreement does not authorize Central States or the Trustees to partially terminate the participation of an Employer and only a subset of its employees.

- 4 -

12.     Defendant Trustees are the trustees and administrators of Central States as established by the Trust Agreement.  The Trustees maintain their principal office at 8647 West Higgins Road, Chicago, Illinois, in the Northern District of Illinois.  Defendants Trustees are also Named Fiduciaries of the Fund as well as fiduciaries pursuant to 29 U.S.C. § 1002(21).

## JURISDICTION AND VENUE

13.     As outlined in more detail herein, the Defendants' threat to expel Penske's bargaining unit represented by Local 745 and the liabilities and/or damages that will result from such expulsion is an act adversely affecting Penske with respect to a multiemployer pension plan and violates the Trust Agreement.

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a); and Sections 502(e)(1) and 4301(a)(1) of ERISA, 29 U.S.C. §§ 1132(e)(1) and 1451(a)(1).  This Court is authorized to enter declaratory relief pursuant to 28 U.S.C. § 2201(a).

15.     Venue is proper in this District because the Fund is administered in this District, the Board of Trustees has its principal office in this District, and because the Trust Agreement governing Defendants designated the laws of Illinois in its choice of law provisions and specifically designated venue in the United States District Court for the Northern District of Illinois, Eastern Division.  Venue is also proper in this District pursuant to Sections 502(e)(2) and 4301(d) of ERISA, 29 U.S.C. §§ 1132(e)(2), and 1451(d) Section 301 (a) and (c) of the LMRA, 29 U.S.C. § 185 (a) and (c).

## LEGAL BACKGROUND

### Multiemployer Plans and Withdrawal Liability

16.     ERISA regulates private pension plans, including multiemployer plans.  *Nachman Corp. v. PBGC*, 446 U.S. 359, 361-62 (1980) (citing 29 U.S.C. § 1001(a)), 29 U.S.C. § 1002(41).

17.      Participants in multiemployer plans do not sacrifice pension benefits by working for multiple employers because service for any contributing employer is credited by the plan. *Sofco Erectors, Inc. v. Trustees of the Ohio Operating Eng'rs Pension Fund*, No. 20-3639, 2021 WL 4434226, at *1 (6th Cir. Sept. 28, 2021) (citations omitted).

18.     A board of trustees administers these multiemployer plans.

19.     The Multiemployer Pension Plan Amendments Act ("MPPAA") amended ERISA and was designed to have employers exiting multiemployer plans to pay for their "fair share of the plan's unfunded liabilities" upon their exit from the plan.  *Pension Benefit Guaranty Corp. v. R.A. Gray Co.*, 467 U.S. 717, 723 at n.3 (1984).

### Complete and Partial Withdrawal Liability

20.     ERISA (as amended by MPPAA) distinguishes between a "complete" and a "partial" withdrawal.  See 29 U.S.C. §§ 1383, 1385.

21.     A complete withdrawal occurs when there is a permanent cessation of the employer's obligation to contribute under the plan or a permanent cessation of the employer's covered operations under the plan.  29 U.S.C. § 1383(a).

22.     When a complete withdrawal occurs, it is the fund's responsibility to calculate the withdrawal liability using one of several statutorily approved formulas, notify the employer of the amount, and collect that amount from the employer.  *See* 29 U.S.C. § 1382.

23.     The calculation of a complete withdrawal is based on the contribution history of the employer and the financial status of the fund as of the plan year *before* the withdrawal.

- 6 -

*Trustees of Iron Workers Loc. 473 Pension Tr. v. Allied Prod. Corp.*, 872 F.2d 208, 210 (7th Cir. 1989).

24.     Thus, for complete withdrawals, the fund usually issues its assessment within 12 months of the withdrawal, and often much sooner. *See e.g., RLJ Lodging Tr. v. Nat'l Ret. Fund*, No. 17 C 7245, 2018 WL 4052171, at *2-3 (N.D. Ill. Aug. 24, 2018) (withdrawal liability assessed within three months of complete withdrawal); *Cent. States, Se. & Sw. Areas Pension Fund v. Stephens*, No. 15 C 10828, 2018 WL 1586242, at *9 (N.D. Ill. Apr. 2, 2018) (withdrawal liability assessed within five months of complete withdrawal); *Cent. States, Se. & Sw. Areas Pension Fund v. Frate Serv., Inc.*, No. 16 C 4346, 2017 WL 8792690, at *1 (N.D. Ill. Nov. 14, 2017) (withdrawal liability assessed within eight months of complete withdrawal).

25.     To prevent employers from circumventing withdrawal liability by reducing—but not completely ceasing—their contribution obligations to a plan, MPPAA established partial withdrawal liability.

26.     A partial withdrawal is *either* a 70% decline in the employer's contribution *or* "a partial cessation of the employer's contribution obligation." 29 U.S.C. § 1385(a).

27.     A partial cessation of the employer's contribution obligation occurs if:

> (i)      the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location or to an entity or entities owned or controlled by the employer, or

> (ii)     an employer permanently ceases to have an obligation to contribute under the plan with respect to work performed at one or more but fewer than all of its facilities, but continues to perform work at the facility of the type for which the obligation to contribute ceased.

- 7 -

29 U.S.C. § 1385(b)(2)(A).

28.     In the event of a partial withdrawal, the employer's withdrawal liability is equal to a portion of the otherwise applicable complete withdrawal.  But, the calculation of the partial withdrawal is based, in part, on the employer's contribution history for the plan year *after* the withdrawal.  29 U.S.C. § 1386(a).

29.     If an employer partially withdraws from a fund in the 2021 plan year, the fund would not be able to assess the employer the withdrawal liability until after the conclusion of the 2022 plan year (and after the fund 'closed its books' on 2022, which typically does not happen until several months into 2023, at the earliest).

30.     If an employer partially withdraws from Central States in the 2021 plan year, it will not receive any withdrawal liability assessment until at least 2023.

### ERISA's "Evade or Avoid" Provision and the Labor Dispute Exception

31.     The "evade or avoid" provision of ERISA § 4212(c) provides that "if a principal purpose of any transaction is to evade or avoid liability under this part [regarding withdrawal liability], this part shall be applied (and liability shall be determined and collected) without regard to such transaction."  29 U.S.C. § 1392(c).

32.     The labor dispute exception of ERISA § 4218(2) provides that an employer will not be considered to have withdrawn "solely because . . . an employer suspends contributions under the plan during a labor dispute involving its employees."  29 U.S.C. § 1398(2).  This section neutralizes the possible immediate imposition of withdrawal liability from influencing the course of labor negotiations.  *See e.g.*, *I.A.M. Nat. Pension Fund, Ben. Plan C v. Schulze Tool and Die Co*., Inc. 564 F. Supp. 1285, 1295 (N.D. Cal. 1983).

## FACTUAL BACKGROUND

### The Local 745 Collective Bargaining Agreement

33.     Penske and Local 745 have entered into a series of successive collective bargaining agreements dating back decades.  The most recent collective bargaining agreement became effective March 1, 2016 ("2016 CBA").  The 2016 CBA provides that it will remain in full force until March 1, 2021.  A true and correct copy of the 2016 CBA is attached hereto as **Exhibit C**.

34.     Ten of Penske's 99 CBAs nationwide, including the 2016 CBA, require Penske to make contributions to Central States for its employees' pension.

35.     Article 28 of the 2016 CBA specifically provides that Penske contribute a weekly amount for each eligible employee (those that have worked for 30 days or more) to the Fund.

36.     Penske has made—and continues to make—all required contributions to Central States.

37.     Like the Trust Agreement, the 2016 CBA recognizes that contributions to the Fund must continue to be made after the expiration of the CBA if a new agreement or impasse has not been reached.  *See* **Exhibit C** at Article 28, Section 3 (providing that the Employer may reopen the agreement for negotiations to seek offset to any pension increases or surcharges occurring after the expiration of the agreement and before a new agreement or impasse is reached).

### Memorandum of Understanding and Unfair Labor Practice Charge

38.     Prior to the expiration of the 2016 CBA, Penske and the Union negotiated and agreed to a memorandum of understanding ("MOU").  The MOU extended the term of the 2016 CBA through March 1, 2022.  A true and correct copy of the MOU is attached hereto as **Exhibit D**.

39.     Penske and the Union agreed to the one-year extension in the MOU because the COVID-19 global pandemic prevented the type of typical, sustained bargaining required to negotiate a longer-term labor contract.  Employee health and safety concerns, travel restrictions, unpredictable finances, compliance with changing national and local regulations, and other COVID-19 ramifications all created a desire between both Penske and the Union to postpone full-scale bargaining over a new agreement for one year.  Moreover, in the early winter of 2020, the Dallas area, specifically, was besieged with its largest COVID surge to-date. *See generally*, Covid Act Now, *Dallas TX Metro*, U.S. COVID Risk & Vaccine Tracker, (last visited Oct. 15, 2021, 6:02 PM), https://covidactnow.org/us/metro/dallas-fort-worth-arlington_tx/?s=24161329.

40.     Penske's desire for a short-term deal was not specific to these Dallas negotiations. In 2020, Penske entered into similar short-term MOUs with its labor unions across the United States.  These MOUs generally varied from 6 to 18 months.

41.     Penske's collective bargaining agreements between the Company and their unions in Pompano Beach, Florida and St. Louis, Missouri also came up for negotiation in 2020.  Both of those contracts required contributions to Central States.  Penske originally asked for short extensions for both contracts (which would mean they would have come up for negotiations again in 2021).  But Penske's requests were rebuffed by the unions at both locations.  Penske and the unions ultimately ended on two-year terms in both cases, as the two-year period was the shortest term the unions would agree to.  Thus, because of the unions' insistence (and not anything Penske wanted), the contracts in Pompano Beach and St. Louis are set to expire in 2022.

42.     The Union ratified the MOU.  A true and correct copy of correspondence from the Union communicating the ratification of the MOU is attached hereto as **Exhibit E.**

43.     Because the Trust Agreement requires that Central States approve all contracts, the MOU was contingent upon approval by Central States.

44.     The Union submitted the MOU to Central States.  Despite the agreement of Penske and the Union, Central States rejected the MOU on or about December 18, 2020.  Central States only communicated its decision to the Union and did not provide any written explanation for its decision.

45.     On February 23, 2021, Penske filed an Unfair Labor Practice Charge ("ULP") with the National Labor Relations Board ("NLRB") against the Central States for violating Section 8(b)(3) of the National Labor Relations Act, 29 U.S.C. § 158(b)(3), when it acted as a labor organization in rejecting the MOU but failing to bargain in good faith with Penske.  A true and correct copy of the ULP is attached hereto as **Exhibit F**.

46.     The ULP is currently pending on appeal before the General Counsel of the NLRB.

### Unit Clarification Petition

47.     After Central States summarily rejected the MOU, Penske and the Union set out to bargain a new collective bargaining agreement to replace the 2016 CBA.

48.     In 2016, during the negotiations for the 2016 CBA, Penske pressed the Union to treat the Duncanville and Dallas locations as their own units.  The Union, however, refused to divide the units; in order to keep labor peace, Penske ultimately agreed to the 2016 CBA.

49.     Now, in 2020, and faced with full blown negotiations for an agreement to replace the 2016 CBA, Penske sought the intervention of the NLRB to (in its view) properly split the unit into its two constituent parts.  To that end, on December 30, 2020, Penske filed a petition with the NLRB to split the two Dallas area facilities (Dallas and Duncanville) into two different bargaining units (the "UC Petition").  A true and correct copy of the UC Petition is attached hereto as **Exhibit H.**

- 11 -

50.     Region 16 of the NLRB held a hearing on the UC Petition in March 2021.

**Good Faith Negotiations and Penske's *Status Quo* Contributions to the Fund**

51.     Despite the good-faith dispute between Penske and the Union regarding the proper unit, Penske and the Union have engaged in good faith, arm's length, and, at times, heated bargaining for new labor agreement.

52.     In February 2021, Penske and the Union corresponded about proposed ground rules for the negotiations. Local 745 President, Brent Taylor negotiated on behalf of the Union. He threatened to strike over Penske's reluctance to agree to an indefinite extension of the 2016 CBA and filed an unfair labor practice charge against Penske (which was subsequently dismissed by the NLRB Investigator before Penske was asked to respond substantively to the allegations). True and correct copies of the Union's unfair labor practice charge and the NLRB's approval of the Union's withdrawal of the charge are attached here to as **Exhibit I** and **Exhibit J**, respectively.

53.     At the first negotiation session between Penske and the Union on February 24, 2021, the Union proposed to postpone further negotiations until the bargaining unit dispute was resolved, stating that they did not want the parties to waste time in negotiations if the unresolved bargaining unit issue might undermine tentatively agreed-upon proposals.

54.     On February 25, 2021, Penske accepted the Union's offer to temporarily postpone negotiations. Negotiations were stayed for the remainder of February, and all of March and April 2021.

55.     On March 31, 2021, the NLRB's Regional Director denied the UC Petition. A true and correct copy of the Decision and Order on the UC Petition is attached hereto as **Exhibit K**.

56.     Although Penske filed a Request for Review to the NLRB on April 20, 2021, the parties agreed to proceed with negotiations while that appeal was pending.  A true and correct copy of Request for Review of the Decision and Order on the UC Petition is attached hereto as **Exhibit L**.

57.     The parties met and bargained on May 19, May 20, June 4, June 8, June 28, July 16, July 22, and July 23, 2021.  During these sessions, Penske and the Union discussed a slew of non-economic proposals.  The parties discussed changes to the 2016 CBA's Management Rights Article and the Administrative of Discipline.  The parties rewrote Article 9 addressing Work Rules.

58.     The parties planned to meet on August 26 and August 27, however, on August 23, 2021, Penske's lead negotiator's wife was hospitalized with a serious injury.  Those sessions were, understandably, canceled.

59.     Negotiations between Penske and the Union continued in September 2021.  Because of the employees' concerns over a lack of raises, Penske and the Union agreed to an MOU that provided for periodic retention bonuses to the employees.  A true and correct copy of this MOU is attached hereto as **Exhibit M**.

60.     Apart from the periodic retention bonus MOU, all discussions between Penske and the Union at the bargaining table have been regarding non-economic proposals.

61.      Penske and the Union continue to discuss other key non-economic proposals such as the grievance process (including exiting Texas Cartage Commission) and removing the Union's right to engage in sympathy strikes.

62.     Penske and the Union continue to negotiate in good faith and have not reached impasse.

63.     On September 22, 2021, the NLRB declined to grant Penske's Request for Review concerning the UC Petition. Penske is currently considering whether it wishes to appeal this decision further. A true and correct copy of the appeal denial is attached here to as **Exhibit N**.

64.     Despite this ongoing labor dispute, under the Trust Agreement and under the *status quo* obligations of the NLRA, Penske has continued to make on-time contributions to Central States.

### Central States' Threat to Partially Expel Penske from the Fund

65.     On September 28, 2021, Jason Childress, Central States' Contracts Department Manager sent Penske and the Union a letter stating that the Contracts Subcommittee would be meeting on October 12, 2021, to determine "this group's continued participation in the Fund." The letter further advised Penske and the Union that it would make a recommendation to the Trustees before their November 16, 2021, meeting "for formal action." A true and correct copy of this September 28, 2021, correspondence is attached here to as **Exhibit O**.

66.     On September 30, 2021, Penske responded to Central States seeking clarification of the meaning of the Fund's September 28, 2021, letter. A true and correct copy of this correspondence dated September 30, 2021, is attached hereto as **Exhibit P**.

67.     Mr. Childress responded on October 4, 2021. In his response, Mr. Childress informed Penske that Central States was considering whether it would prohibit Penske's bargaining unit represented by Local 745 from continuing to participate in the Fund under Article IV, Section 20 of the Trust Agreement. Mr. Childress expressed concern that Penske was considering withdrawing from Central States; he opined that:

>       the expiration date of each of the nine collective bargaining
>       agreements that have been received by the Pension Fund for the
>       ten Penske groups other than the Local 745 group that participate

> in the Pension Fund have now been lined up for the possibility of negotiations over terms that will become effective in 2022, including negotiations over the continued participation of all of these groups in the Pension Fund. . . . . At no time in the past have the expiration dates of all of Penske's participating groups been lined up for a potential withdrawal of all the groups from the Pension Fund in the same calendar year, which could significantly reduce Penske's withdrawal liability exposure. Indeed, it appears that a principal purpose of such transaction is to evade or avoid withdrawal liability, in violation of ERISA section 4212(c). We plan to make the Subcommittee aware of these circumstances at the October 12, 2021 meeting.

A true and correct copy of this October 4, 2021, correspondence is attached here to as **Exhibit Q**.

68.     On October 6, 2021, Penske responded to Central States. In its response, Penske stated, in part:

> First, the circumstances you describe do not reference a transaction of any sort. In the midst of a global pandemic and all of the uncertainty that came with it, we were asking all of our unions (even those that do not make contributions to Central States) for short term deals. And, as you note, this has resulted in a number of agreements up for negotiation in the near future. This was not the result of any ill intent or grand design, but we appreciate your bringing the circumstances to our attention.

Penske also explained to Mr. Childress that the Trust Agreement does not give Central States the authority to expel only one bargaining unit (as opposed to the entire Employer group). Penske reiterated that it has been (and will continue to) faithfully make all of its contributions to Central States as required under the status quo requirements of the NLRA, while the parties negotiate a new CBA. Penske told Central States that it had not even begun to discuss economic terms of the agreement, including pension. Penske also speculated that Central States' threat to expel Local 745 may have been inspired by the unfair labor practice charge Penske filed against the Fund when it rejected the one-year MOU extension. Penske requested that Mr. Childress alert it immediately after the October 12 meeting as to the Committee's recommendation to the

Trustees. A true and correct copy of this October 6, 2021, correspondence is attached hereto as **Exhibit R**.

69.     Although Penske reached out to Mr. Childress seeking an update as to the Committee's recommendation (if any) to the Trustees, as of today, October 18, 2021, Mr. Childress has not responded.

70.     Based on this sequence of events, and upon information and belief, Penske believes that, on November 16, 2021, the Trustees will vote to eject Local 745 from the Fund which will immediately trigger an irreversible partial withdrawal for Penske (with accompanying withdrawal liability).

71.     MPPAA's complicated withdrawal liability formulas make a partial withdraw alone, whether followed by subsequent partial or complete withdrawal, or even continuing contributions for all other employer units, significantly and dramatically expensive. Were Penske simply to continue operations in 2022 as they exist in 2021, the liability after the Dallas expulsion would be well over $10 million.

## SPECIFIC CLAIMS

### FIRST CLAIM FOR RELIEF
**(Declaratory Judgment)**

72.     Paragraphs 1 through 71 of this Verified Complaint are fully incorporated herein by reference.

73.     Penske brings this claim for declaratory relief pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202.

74.     An actual, justiciable controversy exists between Penske and Defendants, which the Court can resolve with finality by declaring the rights of the parties.

75. Defendants have threatened to expel Penske's Local 745 employees from participation in the Fund.

76. Defendants' threatened actions are in direct violation of the terms of the Trust Agreement.

77. The Trust Agreement is a contract between an employer and a labor organization representing employees in an industry affecting commerce.

78. The Trust Agreement is an agreement significant to the maintenance of labor peace.

79. Penske has performed all of its obligations under the Trust Agreement.

80. Under Section 301 of the LMRA, 29 U.S.C. § 185, Penske is entitled to a judicial interpretation of the pending dispute with Defendants, including Defendants' violation of the Trust Agreement.

81. Penske is an employer adversely affected by the acts or omissions of Defendants with respect to a multiemployer plan.

82. Under Section 4301(a)(1) of ERISA, 29 U.S.C. § 1451(a)(1), Penske is separately entitled to judicial interpretation of the pending dispute with Defendants, including Defendants' violation of the Trust Agreement.

83. Defendants' threatened actions and violation of the Trust Agreement are further contrary to the NLRA, including 29 U.S.C. §§ 158(a)(5) and 158(d), which require Penske to continue bargaining collectively with the Union and to maintain the *status quo* with respect to wages, hours, and other terms of employment—including pension contributions. Defendants' threatened actions and violation of the Trust Agreement will force Penske to commit an unfair labor practice with regard to the Union. Penske is separately entitled to judicial interpretation regarding Defendants' NLRA violations.

- 17 -

84. Defendants' threatened actions will cause Penske to wrongly incur significant partial withdrawal liability.

85. Defendants' threatened actions are unlawful and Penske is entitled to declaratory relief and temporary and permanent injunctive relief.

**WHEREFORE**, Plaintiff requests the following relief against Defendants:

(a) Entry of temporary, preliminary, and permanent injunctive relief prohibiting Defendants from violating the terms of the Trust Agreement or taking any action that would create a partial withdrawal under 29 U.S.C. § 1385 for Penske, including, but not limited to, ejecting Penske's Local 745 bargaining group from the Fund.;

(b) Entry of declaratory judgment stating that, pursuant to the Trust Agreement, LMRA, ERISA, and the NLRA, Defendants are prohibited from partially expelling Penske (including specifically its employees represented by Local 745) from the Fund;

(d) An award of costs, attorneys' fees, and any other relief as deemed to be warranted by this Court.

Respectfully submitted,

Sarah Bryan Fask

Sarah Bryan Fask, Esq.
LITTLER MENDELSON, P.C.
1601 Cherry Street
Suite 1400
Philadelphia, PA 19102
Tel: 267-402-3070
Fax: 267-402-3131

Lawrence D. Levien, Esq.
(*admission forthcoming*)
LITTLER MENDELSON, P.C.
815 Connecticut Avenue NW
Suite 400
Washington, D.C. 20006
Tel: 202-772-2535
Fax: 202-842-0011

*Attorneys for Plaintiff Penske Truck Leasing
Co., L.P.*

Dated: October 18, 2021

## V E R I F I C A T I O N

In accordance with 28 U.S.C. § 1746, I Steve Lozon verify under penalty of perjury as follows:

1.    That I am the Senior Vice President, Labor Relations of Penske, and as such, I have been given the authority to make this Verification on behalf of Penske; and

2.    That I have read the foregoing Verified Complaint and know the contents thereof, and that the allegations made therein are true and correct, except those which are made upon information and belief, which I believe to be true to the best of my knowledge.

EXECUTED this 18th day of October, 2021.

_____
Steve Lozon
Penske

4818-2489-9326.7 / 099112-1012