## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PENSKE TRUCK LEASING CO., L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 21-cv-05518 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| CENTRAL STATES, SOUTHEAST & | ) | |
| SOUTHWEST AREAS PENSION PLAN, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Penske Truck Leasing Co., L.P. ("Penske"), a company specializing in the leasing, rental, and maintenance of over-the-road trucks and trailers, has filed suit seeking a declaratory judgment and injunction against Defendants Central States, Southeast and Southwest Areas Pension Plan and its Trustees (together, "Central States" or the "Fund"). Specifically, Penske seeks to prevent Central States from proceeding with its intended expulsion of Penske's Dallas, Texas employee bargaining unit, Local Union No. 745 ("Local 745"), or otherwise creating a partial employer withdrawal under 29 U.S.C. § 1385. After the Trustees voted to expel Local 745 on December 14, 2022, the Court granted Penske's request for a temporary restraining order ("TRO") to maintain the status quo while the parties proceeded with expedited discovery and preliminary injunction briefing. (Dkt. No. 26.) Penske's motion for a preliminary injunction (Dkt. No. 43) is now fully briefed and ripe for ruling. In its motion, Penske claims that the Trustees' decision to expel Local 745 violates the parties' Trust Agreement, is arbitrary and capricious, violates the Employee Retirement Income Security Act of 1974 ("ERISA"), and will

force Penske to violate the National Labor Relations Act ("NLRA"). For the following reasons, Penske's motion for a preliminary injunction is denied.

## BACKGROUND

Penske operates locations across the United States and currently has 99 collective bargaining agreements with unions, including Local 745. (Compl. ¶ 3, Dkt. No. 1.)[1] Penske and Local 745 have entered into numerous collective bargaining agreements over the years. (*Id.* ¶ 33.) The most recent collective bargaining agreement between the two ("2016 CBA") required Penske to make employee benefits contributions to Central States, a multiemployer pension fund governed by a Trust Agreement that binds employer associations. Penske and Local 745 agreed that the 2016 CBA would expire on March 1, 2021. (Def.'s Resp., Ex. D, 2016 CBA at 71, Dkt. No. 48-5.)

Before the 2016 CBA expired, Penske and Local 745 negotiated a memorandum of understanding ("MOU") providing for a one-year extension of their agreement. (Compl., Ex. D, MOU at 2, Dkt. No. 1-6.) Local 745 submitted the MOU to Central States for approval. (Compl. ¶¶ 43–44.) Since at least 2009, the Trustees have reviewed all collective bargaining agreements between participating employers and collective bargaining units with durations less than two years ("short-term agreements"), to decide whether to accept the agreements. (Defs.' Resp., Ex. A, Sprau Decl. ¶ 10, Dkt. No. 48-2.) Though the Trustees typically approve short-term agreements, they specifically review whether the agreements appear to attempt to avoid benefit reductions or

---

[1] The facts summarized here are taken from Plaintiff's verified complaint, *see Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017) (noting that a verified complaint is not just a pleading but also the equivalent of an affidavit), the parties' briefs supporting and opposing preliminary injunctive relief, and the accompanying exhibits. The Court identified no factual dispute requiring an evidentiary hearing and the parties did not request one. *See Dexia Cred. Local v. Rogan*, 602 F.3d 879, 884 (7th Cir. 2010) (explaining that "the court need not conduct an evidentiary hearing unless one is called for as a result of a fact issue created by the response to a motion for a preliminary injunction").

reduce withdrawal liability exposure.[2] (*Id.*) The Trustees accordingly reviewed Penske and Local 745's MOU. (Pl.'s Mem. of Law in Supp. of Mot. for Prelim. Inj. ("Pl.'s Mem. of Law"), Ex. K, Contracts/Collections Meeting at 5, Dkt. No. 44-12.)

In December 2020, Central States rejected the MOU. (Compl. ¶ 44.) Later, in 2021, Central States informed Penske that its Contracts Subcommittee would be determining Local 745's "continued participation in the Fund" and presenting the issue to the Trustees. (Compl., Ex. O, Sept. 28, 2021 Letter from Central States to Penske at 2, Dkt. No. 1-17.) Upon informing Penske that it would be looking into this issue, Central States invited Penske and Local 745 to provide any relevant information for Central States's review. (Compl., Ex. O, Sept. 28, 2021 Letter from Central States to Penske at 2.) Notably, the Trust Agreement—recently amended in September 2021—contains specific provisions regarding expulsions of participating groups. (Def.'s Resp., Ex. C, Trust Agreement at Art. IV, Sec. 20, Dkt. No. 48-4.)

On October 18, 2021, before Central States had completed its review of Local 745's continued participation, Penske filed this lawsuit seeking a declaratory judgment and injunctive relief on the grounds that the Trustees' planned expulsion of Local 745 would violate the Trust Agreement, the NLRA, and ERISA. (Compl. ¶¶ 72–85.) Penske also filed a motion for a TRO. At that time, the Trustees had not yet voted to expel Local 745 but had a meeting scheduled for November 16, 2021 to consider the matter. After a discussion with the parties, the Court entered an Agreed Order that would maintain the status quo until November 30, 2021. (Dkt. No. 19.) The Trustees met as scheduled on November 16 but deferred action with respect to Local 745 until the next scheduled meeting on December 14, 2021. Accordingly, the Court, with the agreement of the parties, extended the Agreed Order through December 24, 2021. (Dkt. No. 20.) On December 14,

---

[2] Withdrawal liability is "the amount determined . . . to be the allocable amount of unfunded vested benefits" required to be paid by an employer to a multiemployer plan. 29 U.S.C. § 1381.

2021, the Trustees ultimately decided to expel Local 745 from the Fund. (Pl.'s Dec. 16, 2021 Letter to the Court at 1–2, Dkt. No. 21.)

On December 24, 2022, this Court granted a TRO in Penske's favor. (12/24/2022 Order Granting Temporary Restraining Order at 7, Dkt. No. 26.) In so doing, the Court considered various issues, including whether Penske's claims were subject to mandatory arbitration and whether the Court possessed subject-matter jurisdiction. (*Id.* at 3–4.) The Court ultimately determined that it possessed federal question jurisdiction based on ERISA.[3] (*Id.*) The Court then proceeded to evaluate Penske's likelihood of success on the merits, the adequacy of remedies at law, the likelihood of irreparable harm to Penske if a temporary restraining order were not granted, the balance of the harms to the parties, and the public interest, all in light of this Circuit's "sliding-scale approach." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001) (explaining that, under the "sliding-scale approach," "the more likely the plaintiff [is to] succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position").

Because the balance of the potential harms articulated by the parties at the TRO stage weighed heavily in Penske's favor, the Court found that Penske had shown a sufficient likelihood of success on the merits to support a TRO. This finding rested in significant part on Penske's proffered argument and evidence that Central States had amended the Trust Agreement in bad faith and without notice to Penske ***after*** the parties' dispute had arisen for the purpose of allowing an expulsion that Central States knew to be improper under the original Trust Agreement.

---

[3] Central States has asked the Court to revisit the issue of subject-matter jurisdiction and to find jurisdiction proper for a different reason. The Court sees no reason to reconsider this issue in connection with the preliminary injunction motion, however, as all parties agree that this Court has subject-matter jurisdiction and Central States has not raised any argument in its briefing that causes the Court to question its initial ruling on subject-matter jurisdiction.

The expedited discovery allowed in connection with Penske's motion for a preliminary injunction was to focus on the circumstances surrounding Central States's amendment of the Trust Agreement. In addition to the fruits of the expedited discovery, the Court now also has the benefit of the complete administrative record associated with the Trustees' decision to expel Local 745. (Def.'s Resp., Ex. D, 2016 CBA at 71.) The administrative record contains agendas and minutes of Central States's Contracts Subcommittee meetings, documents Penske provided to the Trustees for their review—including Penske's verified complaint and exhibits containing the 2016 CBA, MOU, party correspondence, National Labor Relations Board ("NLRB") investigation documents, Penske's brief in support of a TRO, and its reply brief to that motion—and correspondence between Central States and Local 745.

## DISCUSSION

To obtain a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, a plaintiff first "must establish that it has some likelihood of success on the merits; that it has no adequate remedy at law; [and] that without relief it will suffer irreparable harm." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (internal quotation marks omitted). If the plaintiff demonstrates those requirements, the Court "must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Id.* (internal quotation marks omitted). In this Circuit, courts employ a "sliding-scale approach:" the more likely a plaintiff is to prevail on the merits, the less the balance of harms must weigh in its favor; correspondingly, the less likely a plaintiff is to prevail, the more the balance must weigh in its favor. *GEFT Outdoors*, 922 F.3d at 364; *see also Ty*, 237 F.3d at 895 (explaining that under the "sliding-scale approach," "the more

likely the plaintiff [is to] succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position").

Overall, "[a]n applicant for preliminary relief bears a significant burden" and must make a "strong showing." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). The Court is mindful that granting preliminary injunctive relief "is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1085 (internal quotation marks and citation omitted), Indeed, a preliminary injunction is an "extraordinary remedy" that is "never awarded as a matter of right." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017).

## I.      Likelihood of Success on the Merits

The Court turns first to Penske's likelihood of success on the merits. At the TRO stage, the Court was most persuaded by Penske's argument that the amended version of the Trust Agreement from September 2021—which for the first time included language appearing to authorize the expulsion of individual groups just as Central States was considering doing with respect to Local 745—was adopted in bad faith. Aside from the suspicious timing of the amendment (*i.e.*, just as the dispute between Penske and Central States was coming to a head), Penske argued that it received no notice of the amendment, that the amendment was not posted on Central States's website, and that Central States had provided no evidence of when the amendment was passed or whether proper procedures followed.

Penske's arguments for its likelihood of success at the preliminary injunction stage are somewhat different. After conducting expedited discovery, Penske effectively concedes that the evidence does not bear out its theory that the Trust Agreement was amended in bad faith. As a result, Penske acknowledges that the amended Trust Agreement governs the Court's analysis.

Penske's main arguments for likelihood of success are now that (1) the Trustees did not have the authority to expel Local 745 pursuant to the amended Trust Agreement; (2) the Trustees' decision to expel Local 745 was arbitrary and capricious; (3) the Trustees' decision violates ERISA; and (4) that the Trustees' decision will cause Penske to violate its obligations under the NLRA.

### A.      Standard of Review

As an initial matter, Penske contends that the Court must review Central States's interpretation of the Trust Agreement *de novo* rather than by applying an arbitrary and capricious standard of review. In arguing for *de novo* review, Penske distinguishes between determination of the Trustees authority under the Trust Agreement and review of the expulsion decision made pursuant to that authority. According to Penske, only the Trustees' actual decision is subject to deferential arbitrary and capricious review. Central States disagrees, pointing to the language in the Trust Agreement proving that the Trustees "are vested with discretionary and final authority in construing plan documents." (Def.'s Resp., Ex. C, Trust Agreement at Art. IV, Sec. 20.)

The arbitrary and capricious standard has been described as the "least demanding form of judicial review" and provides that a decision "will not be disturbed so long as 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome,' 'the decision is based on a reasonable explanation of relevant plan documents,' or the decision is based 'on a consideration of the relevant factors that encompass the important aspects of the problem.'" *Carlson v. Northrop Grumman Corp.*, 333 F.R.D. 415, 421 (N.D. Ill. 2019) (quoting *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008)). For a court to find a decision or interpretation to be arbitrary and capricious, the plaintiff must show that a party not only made the wrong call, but that the party made a "downright unreasonable" one. *Chojnacki v. Georgia-Pac. Corp.*, 108 F.3d 810, 816 (7th Cir. 1997). Nonetheless, the Court's deference does not

require it to be a mere "rubber stamp." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009). "In some cases, the plain language or structure of the plan or simple common sense will require the court to pronounce an administrator's determination arbitrary and capricious." *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001).

The scope of discretion given to the administrator of a fund to interpret or apply governing documents drives the standard of review: "arbitrary and capricious review attaches to a broad grant of discretion." *Bator v. Dist. Council 4*, 972 F.3d 924, 929 (7th Cir. 2020). To determine whether a plan gives discretion to its trustees, courts review plan language *de novo* as they would any other contract. *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 637 (7th Cir. 2005). Here, the Trust Agreement states as follows:

> The Trustees, by majority action, shall have the ***power to construe*** the provisions of this Agreement, any participation agreement, the Pension Plan, any Agreement drafted by the Fund or to which the Fund is party and rules or regulations of the Pension Fund; and any construction adopted by the Trustees in good faith shall be binding upon the Union, Employees and Employers. The Trustees are vested with ***discretionary and final authority*** in construing plan documents of the Pension Fund and any other agreement, rule or regulation described in this section 17.

(Def.'s Resp., Ex. C, Trust Agreement at Art. IV, Sec. 20 (emphasis added).) The Trust Agreement further states:

> The Trustees are vested with ***discretionary and final authority*** in making all such decisions, including Trustee decisions upon claims for benefits by participants and beneficiaries of the Pension Fund and other claimants, and ***including Trustee decisions construing plan documents*** of the Pension Fund.

(*Id.* at Article V, Sec. 2 (emphasis added).) This language grants broad discretion to the Trustees with respect to the interpretation of and decisions made pursuant to the Trust Agreement. *See Exbom v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 900 F.2d 1138, 1141 (7th Cir. 1990) (applying arbitrary and capricious standard to nearly-identical language that "Article IV, Section 17 of the Trust Agreement gives the Trustees power to construe the provisions of the

8

Agreement and the Plan, and also states that any construction adopted by the Trustees in good faith is binding").

Given this broad grant of discretion, the arbitrary and capricious standard applies even to the Trustees' interpretation of the limits of its their authority under the Trust Agreement, and it certainly applies with respect to the actual expulsion decision. Where a court applies arbitrary and capricious review, this "[d]eferential review of an administrative decision means review on the administrative record." *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 982 (7th Cir. 1999). While the Trustees must give specific reasons for their decision, "that is not the same thing as giving the reasoning behind the reasons." *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996). Further, the Trustees must only give the reason for their decision; they do not have to explain "why it is a ***good*** reason." *Id.* at 923. It is under this standard of review that the Court analyzes both the Trustees' interpretation of their authority to expel Local 745 pursuant to the Trust Agreement, and the Trustees' ultimate decision to expel Local 745.

### B. Trustees' Authority to Expel Penske

Penske claims that the Trust Agreement only allows the Trustees to expel a single bargaining unit if they also "reject[] and/or terminat[e] . . . a collective bargaining agreement, participation agreement or other agreement." (Def.'s Resp., Ex. C, Trust Agreement at Art. IV, Sec. 20.) According to Penske, the Trustees did not have authority to expel Local 745, by itself, because they did not simultaneously reject a collective bargaining agreement, participation agreement, or other agreement. Therefore, the Trustees could only expel an ***entire*** employer—in this case, Penske—which they did not. The applicable provision of the amended Trust Agreement, Article IV, Section 20, provides as follows:

> The Trustees are authorized to reject any collective bargaining agreement, participation agreement and/or terminate the participation of an Employer (and all Employer

Contributions from the Employer) whenever they determine that the agreement is unlawful and/or inconsistent with any rule or requirement for participation by Employers in the Fund and/or that the Employer is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund . . . and/or they determine that continued participation by the Employer is not in the best interest of the Fund. Any such rejection and/or termination by the Trustees of a collective bargaining agreement, participation agreement or other agreement shall be effective as of the date determined by the Trustees (which effective date may be retroactive to the initial date of the term of the rejected agreement) and ***shall result in the termination of the affected group*** and all Employees of the Employer in the affected group from further participation in the Fund on and after such effective date. ***The rejection/termination of one or more of the Employer's groups that participate in the Fund under this provision shall not affect the continued participation of any other group of the Employer that participates in the Fund.***

(Def.'s Resp., Ex. C, Trust Agreement at Art. IV, Sec. 20 (emphasis added).)

Applying the arbitrary and capricious standard of review, the Court finds that the Trustees' interpretation of the Trust Agreement as providing authority to expel a single bargaining unit is within the "range of reasonable interpretations." *Green v. UPS Health & Welfare Package for Retired Emps.*, 595 F.3d 734, 738 (7th Cir. 2010). While the first sentence of Article IV, Section 20 states that the Trustees may "terminate the participation of an Employer" (Def.'s Resp., Ex. C, Trust Agreement at Art. IV, Sec. 20), the remainder of the provision implies that this portion should be read as "terminating an employer or ***the affected group*** of an employer." For example, subsequent language states, "[a]ny such rejection and/or termination by the Trustees of a collective bargaining agreement, participation agreement or other agreement shall be effective as of the date determined by the Trustees . . . and shall result in the termination of the affected group," indicating that the Trustees may terminate less than all of the employer's groups. (*Id.*) While not the model of clarity, Article IV, Section 20 can reasonably be interpreted as allowing the Trustees to terminate an affected group of an employer and not just the employer as a whole.

10

### C. Arbitrary and Capricious Review of the Trustees' Decision

Having confirmed the Trustees' authority to expel Local 745, the Court next analyzes the Trustees' decision itself. Here, Penske argues the Trustees' decision to expel Local 745 was arbitrary and capricious for a number of reasons: (1) the Trustees' justifications were illogical; (2) Central States failed to follow its own process; (3) the Trustees failed to investigate properly; and (4) Central States had shifting justifications for its actions. The Court reviews each of Penske's arguments in turn.

#### 1. Trustees' Justifications

Penske contends that the Trustees' justifications for expelling Local 745 were illogical or not authorized by the Trust Agreement, making the decision arbitrary and capricious.

The Trust Agreement allows the Trustees to terminate an affected employer group if they determine (1) that the agreement is unlawful and/or inconsistent with any rule or requirement for participation by Employers in the Fund; (2) that the Employer is engaged in one or more practices or arrangements that threaten to cause economic harm to, or impairment of the actuarial soundness of, the Fund; or (3) that continued participation by the Employer is not in the best interest of the Fund. (Def.'s Resp., Ex. C, Trust Agreement at Art. IV, Sec. 20.) The administrative record with respect to the expulsion decision for Local 745 indicates that the Trustees relied on the latter two rationales. (Pl.'s Mem. of Law, Ex. R(14), Minutes of the Contracts Subcommittee Meeting December 14, 2021 at 251–52, Dkt. No. 44-19 ("The evidence indicates that Penske is engaged in a plan to minimize its withdrawal liability to the Fund that threatens to cause economic harm to, and/or impairment of the actuarial soundness of the Fund. . . . [T]he continued participation of the Local 745 group is not in the best interest of the Fund.").)

In arguing that the justifications for expelling Local 745—rather than Penske as a whole—were illogical, Penske compares the Trust Agreement's allowed reasons for expulsion with the Trustees' stated reasons. Specifically, Penske points to various statements in the Contracts Subcommittee meeting minutes that criticize Penske but not Local 745. (Pl.'s Mem. of Law, Ex. R(14), Dec. 14, 2021 Minutes of the Contracts Subcommittee Meeting at 251–52.) For example, the minutes state that "[t]he evidence indicates that Penske is engaged in a plan to minimize its withdrawal liability to the Fund that threatens to cause economic harm to, and/or impairment of the actuarial soundness of the Fund," and that "the lining up of all ten Penske groups that participate in the Fund for negotiations in 2022 provides Penske with the opportunity to . . . effect a complete withdrawal from the Fund in 2022 that would deprive the Fund of tens of millions in withdrawal liability," among other things. (*Id.*) Since the minutes reflect the Trustees' finding that ***Penske*** caused or threatened to cause economic harm to or impairment of the actuarial soundness of the Fund, Penske claims that the Trustees logically should have expelled ***Penske***, the employer, instead of Local 745, the group. Penske further argues that the rationale that "the continued participation of the Local 745 group is not in the best interest of the Fund" is not a permitted justification for expulsion under the Trust Agreement. (*See id.* at 252.) That is because the language in the Trust Agreement allowing expulsion references only the concern that "continued participation by the ***Employer*** is not in the best interest of the Fund," not that continued participation by a group of an employer is not in the best interest of the Fund. (Def.'s Resp., Ex. C, Trust Agreement at Art. IV, Sec. 20.) This distinction, Penske asserts, shows that the Trustees' justifications for expulsion were unfounded.

But as discussed above, it was reasonable for Central States to interpret the Trust Agreement as allowing expulsion of individual groups of an employer; not just employers in their

entirety. Though Penske focuses on a strict reading of the accepted rationales in the Trust Agreement, Central States posits that the Trustees determined that Local 745 was a component to Penske's lining up of agreements, and that expulsion of Local 745 alone is plainly allowed by the Trust Agreement. Central States further stresses the practical reasons for not expelling the entirety of Penske, including minimizing the harm to other bargaining units, protecting the Fund itself, and allowing Penske more time to consider Central States's alternative proposal.

After reviewing the evidence, the Court is persuaded that the Trustees' justifications for expelling Local 745 were reasonable. As discussed above, the Trustees possess the authority to expel a single employer group, such as Local 745, so long as the justifications are consistent with the Trust Agreement's accepted rationales. And Central States also explains in its briefing that it determined that the short-term agreement with Local 745 was a component in Penske's plan to line up its bargaining agreements. Because of Local 745's involvement and the Trustees' authority, the Trustees' decision to expel Local 745 was reasonable.

The Court also finds that expelling Penske rather than the single bargaining group with which the problem first occurred would have drastic effects on Penske, its other bargaining groups, and the Fund as a whole. Instead of taking this expansive approach, the Trustees chose a narrowly tailored approach that would address the potential harm and minimize the effects on all involved parties. Further, as Central States notes, Penske fails to account for the fact that expulsion of Penske would result in a complete withdrawal—the exact situation Central States sought to avoid. For these reasons, the Court finds the Trustees' decision to have been "based 'on a consideration of the relevant factors that encompass the important aspects of the problem,'" *Carlson*, 333 F.R.D. at 421 (quoting *Speciale*, 538 F.3d at 621), and therefore it was not arbitrary and capricious.

## 2.    Trustees' Expulsion Process

Penske next argues that the Trustees' expulsion decision was arbitrary and capricious because the Trustees failed to follow their own process for terminating an employer or bargaining unit group. According to Penske, procedural violations should be "considered as factors in determining whether [a decision] was arbitrary and capricious." *Weitzenkamp v. Unum Life Ins. Co. of Am.*, 661 F.3d 323, 329 n.3 (7th Cir. 2011). Here, Penske asserts that the Trustees must consider the effects of termination on the plan participants. To support its point, Penske points to Central States's Responses to Penske's First Set of Interrogatories. (Pl.'s Mem. of Law, Ex. Q, Defendants' Responses to Plaintiff's First Set of Interrogatories ("Defs.' Resp. to ROGs") at 8, Dkt. No. 44-18.) There, when asked to describe "Defendants' process for analyzing, if any, the impact of an expulsion on employees' benefits when considering whether or not to expel an Employer or a bargaining unit," Central States responded:

> The Trustees examine the interests of the participants and beneficiaries as a whole when considering whether to expel an employer or bargaining unit. . . . The Trustees also recognize that the termination of a group will impact the future benefit accruals of employees who continue to work for a terminated employer and do not seek employment with another participating employer, and the Trustees consider these effects of termination in making their decision.

(*Id.*) Based on this response, Penske argues that the Trustees are required to consider the effects of expulsion on participants. Penske also identifies deposition testimony from Central States representative Andrew Sprau, where he states that the Trustees would look at the "potential benefit cuts that a member would receive as a result of a termination of participation in the plan." (Pl.'s Mem. of Law, Ex. F, Sprau Dep. at 6:5–16, Dkt. No. 44-7.) Yet Penske claims to find no such consideration in the administrative record.

Central States, in response, contends that the Trustees did not commit a procedural error with respect to considering the impact of benefits on plan participants. Central States first claims

14

that the Trustees only review specific benefit information of participants in certain instances when considering expulsion of an employer. For example, when determining whether Schnuck Markets, Inc. or Sentinel Transportation, L.L.C. would be expelled, the Trustees looked at the average age and years of service of affected employees as a group (not individually) because that was useful to determine whether employers were engaging in adverse selection.[4] (*See* Defs.' Resp., Ex. I, Jan. 10, 2017 Minutes of the Pension Board Meeting – Schnuck at 6–7, Dkt. No. 48-10; Defs.' Resp., Ex. H, Dec. 13, 2011 Minutes of the Pension Board Meeting – Sentinel at 2, Dkt. No. 48-9.) Where, as here, no adverse selection is at issue, the Trustees consider the impact of termination on affected employees by relying on their general knowledge; not specific benefits information. (*See, e.g.*, Defs.' Resp., Ex. F, Sept. 11, 2018 Minutes of the Pension Board Meeting – L&W, Dkt. No. 48-7; Defs.' Resp., Ex. G, Nov. 13, 2018 Minutes of the Pension Board Meeting – Allied, Dkt. No. 48-8.) According to Central States, nothing in this case distinguished Local 745 from any other group that might be expelled; therefore, no specific benefit information was necessary for the Trustees to make their determination.

Central States further argues, in the alternative, that even if the Trustees did commit a procedural error, it was not a "serious procedural error[]" such that the Court should afford less deference to the expulsion decision. *Ferrari v. Tchrs. Ins. & Annuity Ass'n*, 278 F.3d 801, 806 (8th Cir. 2002). In *Ferrari*, the main case cited by Central States in support of its position, the Eighth Circuit explained that it will only give less deference to a plan administrator's decision if there is material and probative evidence of (1) serious procedural errors by the administrator, and (2) a serious breach of the plan administrator's duty to the participant caused by these errors. *Ferrari*, 278 F.3d at 806.

---

[4] Central States describes adverse selection as shifting younger employees to non-covered work to minimize contributions an employer owes to a fund, while keeping only older employees in the fund plan.

"The Seventh Circuit has not expressly ruled on the issue of which standard of review to apply when a plan commits procedural errors . . . ." *Est. of Malecki v. Anheuser-Busch Deferred Income, Stock Purchase & Sav. Plan*, No. 10 C 5072, 2012 WL 2049457, at *9 (N.D. Ill. June 5, 2012). While the Eighth Circuit has found that a less deferential standard may apply where "serious procedural errors" are evident, *Ferrari*, 278 F.3d at 806, other courts perform *de novo* review "when the administrator fails to abide by the procedural protections provided for in the Plan or ERISA." *Est. of Malecki*, 2012 WL 2049457, at *8 (citing *Nichols v. Prudential Ins. Co. of America*, 406 F.3d 98, 109 (2d Cir. 2005) and *Jebian v. Hewlett–Packard Co.*, 349 F.3d 1098, 1105 (9th Cir. 2003)). As of yet, however, the footnote in *Weitzenkamp* stating that procedural errors may be "considered as factors" in applying the arbitrary and capricious standard appears to be the most the Seventh Circuit has said with respect to this issue.

This Court need not decide whether any procedural errors effect the standard of review in this case because no such procedural error has occurred. Penske has not identified a procedure that the Trustees were required to follow but did not. Though Central States's interrogatory response suggests that the Trustees "recognize that the termination of a group will impact the future benefit accruals of employees" and "consider these effects of termination in making their decision" (Pl.'s Mem. of Law, Ex. Q, Defs.' Resp. to ROGs at 8), the interrogatory response does not indicate that such consideration is a required procedure, nor does the Trust Agreement or ERISA mandate it. The exercise of discretion includes the Trustees deciding when and how to take into account the effect of expulsion on Fund participants. The Court therefore finds no procedural error and no evidence that the Trustees acted arbitrarily or capriciously by not relying significantly on the effect of expulsion on participants when making its decision.

### 3.  Trustees' Investigation

Penske also claims that the Trustees failed to investigate properly the relevant questions they identified during the course of their review, rendering the resulting decision arbitrary and capricious. Penske lists four issues that it claims Central States did not examine closely enough: (1) why Central States's rejection of the one-year extension agreement triggered Penske and Local 745's negotiation of non-economic issues (Pl.'s Mem. of Law, Ex. S, Agenda of the Contracts Subcommittee Meeting October 12, 2021 at 8, Dkt. No. 44-20); (2) why Penske did not accept Central States's proposal that, if Local 745 withdrew in 2022, it be treated as a 2021 withdrawal for purposes of withdrawal liability (Pl.'s Mem. of Law, Ex. S, Agenda of the Contracts Subcommittee Meeting October 12, 2021 at 8–9); (3) which party proposed the 2.75-year duration for the contract between Penske and Local 769 (Pl.'s Mem. of Law, Ex. U, Minutes of the Pension Board Meeting November 16, 2021 at 20, Dkt. No. 44-22); and (4) why Penske's circumstances resulting from the pandemic required shorter contracts (Pl.'s Mem. of Law, Ex. U, Minutes of the Pension Board Meeting November 16, 2021 at 20–21).

Penske asserts that the Trustees acted arbitrarily and capriciously by failing to contact Penske about or otherwise to find answers to the outstanding questions. Penske further points to evidence in the record that it extended Central States the opportunity to reach out to Penske with questions, but Central States did not take advantage of that offer. (*See, e.g.*, Pl.'s Mem. of Law, Ex. R(2), Nov. 2, 2021 Letter from S. Fask (Penske counsel) to J. Childress (Central States) at 26, Dkt. No. 44-19 ("Please feel free to reach out to me directly with any other questions or concerns.").) Because inadequate investigation can support a finding that a decision is arbitrary and capricious, *see Quinn v. Blue Cross and Blue Shield*, 161 F.3d 472, 476 (7th Cir. 1998); *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 537–38 (9th Cir. 1990), Penske argues that

Central States's failure to communicate its questions to Penske before the Trustees made their decision demonstrates that the decision was arbitrary and capricious.

Central States responds that the Trustees did not, in fact, have any outstanding questions. Instead, Central States submits that it gave Penske the opportunity to provide any information it wanted the Trustees to consider with respect to expulsion. (Compl., Ex. O, Sept. 28, 2021 Letter from Central States to Penske at 2). And the minutes reflect that Fund staff recommended the Trustees draw adverse inferences based on gaps and inconsistencies in the documents Penske submitted. (Defs.' Resp., Ex. D, Dec. 14, 2021 Agenda of the Contracts Subcommittee Meeting at 17 ("Staff believes the Trustees could conclude that Penske is attempting to minimize withdrawal liability from Penske's unexplained unwillingness to make the proposal that Staff offered to recommend to the Trustees under which a 2022 withdrawal of the Local 745 group would be treated as a 2021 withdrawal.").) Central States thus contends that the Trustees had sufficient information from Penske to make their decision and that any inconsistencies in the documentation could reasonably result in negative inferences against Penske.

"[W]hile ERISA does not require an administrator to conduct a 'full-blown' investigation . . . it does demand a 'reasonable inquiry.'" *Nickola v. Grp. Life Assurance, Co.*, No. 03 C 8559, 2005 WL 1910905, at *11 (N.D. Ill. Aug. 5, 2005) (quoting *O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 961 (7th Cir.2001)); *see also Quinn*, 161 F.3d at 476 (determining that, "by not even performing the slightest inquiry" into whether a plan participant was capable of performing another job with a salary level similar to her current job, the plan administrator's decision that the participant did not qualify for long-term disability benefits was arbitrary and capricious). Still, where there is already "sufficient evidence from the claimant in

the record to make a reasonable decision . . . there is no further obligation to inquire." *Garg v. Emp. Benefits Admin. Comm.*, 52 F. App'x 852, 855 (7th Cir. 2002).

In this case, the Trustee possessed enough information to make a reasonable decision. Nothing in the Trust Agreement requires the Trustees to determine the reason an employer has lined up collective bargaining agreements; whether the employer intended to do so; why the employer would not agree to alternative withdrawal dates; or why an employer sought a short-term agreement, rather than a longer term agreement, with a collective bargaining unit. (Def.'s Resp., Ex. C, Trust Agreement at Art. IV, Sec. 20.) Instead, the Trust Agreement's expulsion provisions only require that the Trustees determine (1) that the agreement is unlawful and/or inconsistent with any rule or requirement for participation by Employers in the Fund; (2) that the Employer is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund; and/or (3) that continued participation by the Employer is not in the best interest of the Fund. (*Id.*) Here, the Trustees determined that Penske was engaged in one or more practices or arrangements that threated to cause economic harm to, or impair the actuarial sounds of, the Fund. Having sufficient information to make that determination, the Trustees were under no obligation to investigate the alleged outstanding questions further, particularly given that Penske had an opportunity to provide all relevant documents for consideration. The Court further finds that the Trustees inquired into each issue Penske has raised here but found the answers from Penske lacking. As it is not the Trustees' duty to generate evidence favorable to a claimant, *Rubber Shop v. Benicorp Ins. Co.*, 238 F.R.D. 618, 622 (N.D. Ind. 2006), nor did the Trustees require answers to these issues for their decision-making process, the Trustees' investigation was reasonable under arbitrary and capricious review.

### 4. Central States's Shifting Justifications

As its final argument that the Trustees' decision was arbitrary and capricious, Penske maintains that the Trustees shifted justifications for their deferral of a decision and engaged in a sham investigation. With this argument, Penske challenges Central States's conduct during the administrative review process, rather than the decision itself. Penske cites *Gallo v. Amoco Corp.* for the proposition that "inconsistent interpretations will provide the court with a handle for pronouncing the administrator's determination arbitrary and capricious." 102 F.3d at 922 (concerning whether two different calculations for plan term "earnings" made determination of participants' pension amount arbitrary and capricious).

The first purported inconsistency to which Penske points regards the Trustees' deferral of its expulsion decision from November 16, 2021 to December 14, 2021. (Pl.'s Mem. of Law, Ex. U, Minutes of the Pension Board Meeting November 16, 2021 at 21.) In particular, Penske submits that, by November 16, the Trustees had already determined that whether Penske intended to line up its collective bargaining agreements was irrelevant and had made its decision. (*See* Pl.'s Mem. of Law, Ex. U, Nov. 16, 2021 Minutes of the Pension Board Meeting at 18 ("But even if it were true that Penske does not now and never has had a plan to completely withdraw from the Fund in 2022, the lining up of all ten groups for negotiations in 2022 provides Penske with the opportunity to do so.").) Meanwhile, Central States's counsel stated in court on November 29, 2021 that the Fund's staff was still investigating and fact-finding. According to Penske, Central States's counsel's statements and the November 16, 2021 meeting minutes are inconsistent and deceitful, such that the Trustees' shifting justifications for the monthlong deferral should be deemed arbitrary and capricious.

Central States responds by assuring the Court that the Trustees had not made their expulsion decision by the November 16, 2021 meeting and that the Trustees deferred their decision for a reason. Central States argues that the minutes from that meeting indicate only that "Staff believe[d]" that Penske's intent was not relevant. (*Id.* at 19.) According to Central States, regardless of the staff's recommendation, the Trustees had made no determination by that point. Central States further contends that its staff did, in fact, continue to engage in fact-finding during the monthlong deferral, and that the Trustees viewed this time as an opportunity for Penske to accept Central States's alternate proposal. Accordingly, Central States argues, the Trustees' choice to defer the expulsion decision was based on genuine reasons and certainly was not arbitrary and capricious.

Central States has the better argument here. The Trustees' justifications for the monthlong deferral are not the kind of "inconsistent interpretations" that the Seventh Circuit contemplated in *Gallo*. Instead, *Gallo* concerned interpretations directly related to a plan administrator's decision. *Id.* The Trustees' rationales for **delaying** its decision—as opposed to the rationales for the decision itself—are of no concern for purposes of the arbitrary and capricious analysis. Regardless, nothing in the administrative record suggests that the Trustees had already decided on expulsion. The November 16, 2021 meeting minutes express the Fund staff's views rather than the Trustees' views. (*See, e.g.*, Pl.'s Mem. of Law, Ex. U, Nov. 16, 2021 Minutes of the Pension Board Meeting at 19.) Moreover, the additional time allowed the parties to consider alternative options that would avoid expulsion. Because the Trustees reasonably deferred their decision to allow time for further investigation and exploration of a negotiated resolution, the Court does not find the Trustees' action to be evidence of arbitrary and capricious decisionmaking.

Penske also contends that the Trustees' December meeting agenda indicated the Trustees' need for information about the number of employees in each bargaining unit (Pl.'s Mem. of Law, Ex. R(14), Minutes of the Contracts Subcommittee Meeting December 14, 2021 at 239), despite them already having this information in November. (Pl.'s Mem. of Law, Ex. U, Minutes of the Pension Board Meeting November 16, 2021 at 7.) Penske does not explain how this purported inconsistency could rise to the level of being arbitrary and capricious. And regardless, Central States explains that the December meeting agenda referred to the number of employees not having been included in the October meeting agenda. (Defs.' Resp., Ex. D, Agenda of the Contracts Subcommittee Meeting December 14, 2021 at 8 ("After a discussion at the October 12, 2021Subcommittee meeting, the Trustees decided to defer the matter and requested that Staff provide additional information, including the number of employees in each bargaining unit."). The Court finds no inconsistency in the language of the documents and certainly none that would render the Trustees' decision-making process arbitrary and capricious.

In sum, for all the above-stated reasons, the record simply does not support a conclusion that the Trustees' decision to expel Local 745 was arbitrary and capricious.

### D.    Violations of ERISA

The Court next turns to Penske's claim that Central States has violated ERISA. Penske alleges that Central States has a rule—written or unwritten—that the Trustees will not allow contributing employers with multiple collective bargaining agreements to have all agreements expire in the same year. To support this conclusion, Penske points to evidence that the Trustees prevented two other contributing employers with multiple collective bargaining groups from completing this kind of complete withdrawal. (Pl.'s Mem. of Law, Ex. A, B, Minutes of Pension Board Meeting September 11, 2018, Dkt. No. 44-1; Pl.'s Mem. of Law, Ex. B, Minutes of

Pension Board Meeting November 13, 2018, Dkt. No. 44-2.) Penske lists various ways in which it believes this alleged rule violates ERISA.

### 1.       Violation of ERISA § 4214(b)

First, Penske argues that the Trustees' alleged rule violates § 4214(b) of ERISA. 29 U.S.C. § 1394(b). This section of ERISA provides:

> All plan rules and amendments authorized under [Subtitle E, part one] shall operate and be applied uniformly with respect to each employer, except that special provisions may be made to take into account the creditworthiness of an employer. The plan sponsor shall give notice to all employers who have an obligation to contribute under the plan and to all employee organizations representing employees covered under the plan of any plan rules or amendments adopted pursuant to this section.

*Id.* In Penske's view, the Trustees' alleged rule fails to treat contributing employers uniformly by creating two classes of employers: those that have only one collective bargaining agreement and may execute a complete withdrawal, and those with multiple collective bargaining agreements that must execute a partial withdrawal before a complete withdrawal. Penske further argues that Central States should have given employers like Penske notice of this rule as required by ERISA. Therefore, Penske claims that the Trustees have violated § 4214(b).

Central States denies Penske's allegation that the Trustees have a rule that prevents employers with multiple collective bargaining agreements from executing a complete withdrawal. To counter Penske's assertion, Central States notes that the Fund currently has 37 employers with multiple collective bargaining agreements that are set to expire in the same year. (Def.'s Resp., Ex. A, Sprau Decl. ¶ 9.) Neither Central States nor the Trustees has objected to these employers having bargaining agreements that expire in the same year. (*Id.*) And no action against these employers has been contemplated. (*Id.*)

Instead, Central States posits that, since at least 2009, the Trustees have reviewed all collective bargaining agreements with a duration of less than two years. (*Id.* ¶ 10.) Though the

Trustees typically approve short-term agreements, they specifically consider whether the agreements appear to be an attempt to avoid benefit reductions or reduce withdrawal liability exposure. (*Id.*) The Trustees make each decision on a case-by-case basis. (*Id.*) This procedure, Central States argues, falls within the Trustees' authority under to the Trust Agreement.

The Court is persuaded that the Trustees have not adopted the rule Penske alleges and that the procedure they do follow represents a reasonable exercise of its discretion under the Trust Agreement. Instead of distinguishing between contributing employers based on the number of bargaining agreements into which they have entered, the record supports that the Trustees follow a process of discerning whether employers are attempting to evade withdrawal liability by proposing short-term agreements. This process enables the Trustees to exercise effectively the authority granted to them under Article IV, Section 20 of the Trust Agreement—in other words, reviewing all short-term agreements allows the Trustees to discern whether an employer is engaged in a practice that threatens economic harm or impairment of the actuarial soundness of the Fund, or whether participation by an employer is not in the Fund's best interest. (Def.'s Resp., Ex. C, Trust Agreement at Art. IV, Sec. 20.) This procedure applies uniformly to all employers that propose short-term agreements.

Accordingly, the Court finds no violation of ERISA § 4214(b).

### 2.    Trust Agreement Inconsistent With ERISA

Penske next argues that the Trustees' application of the Trust Agreement is not "consistent with," and therefore violates, ERISA. 29 U.S.C. § 1104(a)(1)(D). Specifically, Penske contends that the Trustees improperly force employers with multiple collective bargaining agreements into partial withdrawals. Pursuant to 29 U.S.C. §§ 1385(a)(1) and (2), a partial withdrawal occurs in two circumstances: (1) when an employer has a 70% contribution decline, or (2) when there is a

partial cessation of the employer's contribution obligation. According to Penske, the Trustees have created a third circumstance that triggers partial withdrawal: simply being an employer with multiple collective bargaining agreements.

In response, Central States argues that the Trustees acted only pursuant to partial withdrawal liability provisions already present in ERISA. Specifically, ERISA provides that a partial withdrawal occurs "if during such [plan] year the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer had been obligated to contribute under the plan." 29 U.S.C. § 1385(b)(2)(A)(i). According to Central States, that is what has happened here—Local 745's expulsion has resulted in Penske permanently ceasing to have an obligation to contribute under one or more but fewer than all of its collective bargaining agreements. As nothing in 29 U.S.C. § 1385(b)(2)(A)(i) indicates that expulsion is excluded as a cause of a partial withdrawal, Central States views the Trustees' decision as being entirely consistent with ERISA's provisions.

The Court is satisfied that the Trustees' interpretation of the Trust Agreement does not violate ERISA or create a third circumstance for partial withdrawal. Section 1385(a)(2) states that a partial withdrawal occurs when there is a partial cessation of the employer's contribution obligation, and § 1385(b)(2)(A)(i) goes on to describe one instance of partial cessation as occurring when an employer "permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan." Neither of these provisions regarding partial withdrawal exclude expulsion as a valid reason for the partial withdrawal. Therefore, the Trustees' expulsion decision neatly falls into an existing ERISA partial withdrawal provision.

25

3.      **ERISA's Labor Dispute Exception and Preference to Avoid Impacting Labor Negotiations**

Penske's final claimed ERISA violation deals with ERISA's labor dispute exception. That provision of ERISA states that "an employer shall not be considered to have withdrawn from a plan solely because . . . an employer suspends contributions under the plan during a labor dispute involving its employees." 29 U.S.C. § 1398(2). Though this provision governs circumstances in which an employer suspends contributions to a plan, Penske argues that the inverse must be true as well—that is, the provision should be interpreted as not considering an employer to have withdrawn from a plan when the employer continues its contributions to a plan. As applied to the instant matter, Penske asserts that it has continued to contribute to the Fund despite the labor dispute between itself and Local 745 in renegotiating a new collective bargaining agreement. Penske contends that, if Penske is considered to have withdrawn as a result of its expulsion from the Fund, this will influence labor negotiations and directly violate the labor dispute exception. Citing a case from the Northern District of California as an example—*I.A.M. National Pension Fund, Benefit Plan C v. Schulze Tool and Die Co.*, 564 F. Supp. 1285, 1288 (N.D. Cal. 1983)— Penske argues that the Court should apply the labor dispute exception broadly to protect labor negotiations from being affected by the threat of immediate withdrawal liability.

Central States insists that this exception does not apply. Central States notes that the plain language of this ERISA provision indicates that it governs an entirely different circumstance, one in which an employer ***suspends*** its contributions to a plan during a labor dispute. Here, Penske has ***continued*** its contributions. According to Central States, interpreting this provision as Penske would prefer distorts the labor dispute exception altogether. What is more, Central States points to pertinent language from *I.A.M. National Pension Fund* explaining that

> [t]his provision by its terms applies only to a suspension—a temporary interruption—
> because of a labor dispute; it is evidently intended to prevent the risk of withdrawal
> liability from influencing labor-management negotiations when the employer has no
> intention of permanently withdrawing from the plan. The provision does not pertain to a
> permanent termination.

*I.A.M. Nat. Pension Fund*, 564 F. Supp. at 1295. Central States argues that the Trustees' expulsion

of Penske results in its permanent termination; not a suspension or temporary interruption. As

such, the labor dispute exception cannot apply.

The Court agrees that the labor dispute exception does not apply to the circumstances of

Penske's partial withdrawal. The text of 29 U.S.C. § 1398(2) does not concern the situation where

an employer continues to contribute to the plan during a labor dispute—quite the opposite.

Further, Local 745's expulsion equates to a permanent termination; not a temporary suspension of

the bargaining unit or contributions to it. Finally, neither case that Penske cites in support of its

position involves expulsion of an employer or bargaining unit. *See generally 520 S. Michigan*

*Ave. Assocs., Ltd. v. Unite Here Nat. Ret. Fund*, No. 10 C 1395, 2010 WL 3732215, at *2 (N.D.

Ill. Sept. 17, 2010); *I.A.M. Nat. Pension Fund*, 564 F. Supp. 1285, 1288 (N.D. Cal. 1983). Nor do

those cases concern instances in which an employer continues its contributions to a fund. The

Court reads the labor dispute exception as written and finds no violation by the Trustees of this

provision.

### E.     Violation of the NLRA

Lastly, Penske argues that Central States's interpretation of the Trust Agreement will

cause Penske to violate its obligations pursuant to the NLRA to contribute to the Fund after the

expiration of its collective bargaining agreement with Local 745.

The NLRA provides that it is an unfair labor practice for an employer to "refuse to bargain

collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). From this

provision has stemmed the principle that "an employer's failure to honor the terms and conditions of an expired collective bargaining agreement pending negotiations on a new agreement constitutes bad faith bargaining in breach of . . . the National Labor Relations Act." *Laborers Health & Welfare Tr. Fund for N. California v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 544 (1988) (internal quotation marks omitted). Penske's collective bargaining agreement with Local 745 expired in 2020, but Penske has continued to contribute to the Fund in light of the NLRA's requirement that employers maintain the *status quo* during good faith negotiations. AS Relevant to its present dispute with Central States, Penske maintains that Central States's interpretation of the Trust Agreement would result in Penske violating the NLRA by discontinuing its contributions to the Fund.

In response, Central States argues that 29 U.S.C. § 158(a)(5) is not a bright-line rule. Instead, it applies where an employer acts ***unilaterally*** to change working conditions while bargaining with its employees, not when changes occur that are out of the employer's control. *See N.L.R.B. v. Katz*, 369 U.S. 736, 743 (1962) ("We hold that an employer's unilateral change in conditions of employment under negotiation is . . . a violation of [§ 158(a)(5)], for it is a circumvention of the duty to negotiate which frustrates the objectives of [§ 158(a)(5)] much as does a flat refusal."). In support of its position, Central States cites *Central States, Southeast and Southwest Areas Pension Fund v. Jones Motor Corp.*, No. 99 C 1679, 1999 WL 521163 (N.D. Ill. July 13, 1999), a case with circumstances similar to those here. In *Jones*, an employer terminated by a fund argued that it could not be deemed to have withdrawn because it was required to continue to making contributions pursuant to 29 U.S.C. § 158(a)(5). The court found, however, that

> Jones' argument fails to account for the fact that Central States terminated Jones' participation in the plan. . . . ***Because Jones has been expelled from Central States, it is***

>    ***no longer obligated to make contributions.*** Jones argues that its duty of good faith
>    requires it to continue contributing to Central States. But the duty of good faith simply
>    requires Jones to continue to honor the expired bargaining agreement.

*Id.* (emphasis added). In Central States's view, as an event beyond its control, the expulsion of

Penske's Local 745 does away with Penske's obligation under the NLRA to maintain the *status*

*quo*.

This Court agrees with the analysis in *Jones* and similarly finds that the Trustees'

expulsion of Local 745 does not cause Penske to violate the NLRA. Rather, 29 U.S.C. § 158(a)(5)

protects from employers' unilateral changes to the *status quo* of employment conditions and the

Trustees' expulsion (and resulting cessation of contribution obligations) is not a unilateral change

by Penske. As a result, the Court finds that the Trustees' expulsion decision has not caused

Penske to violate the NLRA.

## II.        Inadequate Remedy at Law and Irreparable Harm

For the reasons discussed above, the Court concludes that Penske has not shown that it has

a likelihood of success on the merits and thus its request for preliminary injunctive relief fails.

Nonetheless, the Court will proceed briefly to consider whether Penske has met the remaining

threshold requirements for a preliminary injunction: "that it has no adequate remedy at law, and

that it will suffer irreparable harm if the relief is not granted." *Promatek Indus., Ltd. v. Equitrac*

*Corp.*, 300 F.3d 808, 811 (7th Cir. 2002).

Irreparable harm is harm that is "not fully compensable or avoidable by the issuance of a

final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's

favor." *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735,

740 (7th Cir. 2013). To show irreparable harm, Penske stresses that the circumstances on which

the Court previously focused in granting the TRO—damage to Penske's relationship with Local

745, intensifying already contentious labor negotiations during the pandemic, potential strike issues, and the potential impact to Penske's relationships with other unions—all still exist. With respect to Penske and Local 745's relationship, Penske submits additional evidence demonstrating a long history of challenging relations between the two. For example, Penske claims that, in the three years preceding the latest round of bargaining, Local 745 brought approximately 400 grievances to the final step of the grievance process; meanwhile, other Penske bargaining units only had 63 grievances reach the final step. (Pl.'s Mem. of Law, Ex. W, Feb. 1, 2021 Email from S. Lozon to P. Kraft at 2, Dkt. 45.)

With respect to potential strike issues, Penske offers evidence regarding the various occasions when Local 745 has threatened to strike. In February 2021, for instance, Local 745 threatened to strike upon beginning to negotiate a new collective bargaining agreement with Penske. (Pl.'s Mem. of Law, Ex. X, Feb. 26, 2021 Email from P. Kraft to B. Taylor at 5, Dkt. No. 45 (Kraft: "[S]o long as the Union does not engage in a strike, all wage increases shall be retroactive. . . . The call ended with you threatening to strike."); (Pl.'s Mem. of Law, Ex. Y, Notes from Feb. 26, 2021 Call with B. Taylor at 8, Dkt. No. 45 ("[Taylor] said he would strike if no extension, not just in Texas, but across country.").) Later in October and November 2021, after Central States notified Penske that the Trustees would consider expelling Local 745, Penske braced for another potential strike threat. (Pl.'s Mem. of Law, Ex. AA, Nov. 15, 2021 Email from P. Kraft to D. Lerew, et al. at 16, Dkt. No. 45 ("While Brent [Taylor] tried the strike gambit once before without success, we should not assume a second effort would likewise fall.").) Penske has not presented evidence that Local 745 has, in fact, threatened to strike since the Trustees first began considering expulsion.

Penske further argues that disruptions to its relationship with Local 745 will extend to its other bargaining units. According to Penske, Brent Taylor, the Secretary-Treasurer of Local 745 who appears in various correspondence with Penske representatives, was recently elected to the General Executive Board of the International Brotherhood of Teamsters. Given his position of power and his prior statements to Penske that Local 745 would strike "not just in Texas, but across country" (Pl.'s Mem. of Law, Ex. Y, Notes from Feb. 26, 2021 Call with B. Taylor at 8), Penske remains concerned that expulsion will hamper the trust between itself and other local unions, and imperil negotiations for new bargaining agreements with them. More generally, Penske argues that moving forward with Local 745's expulsion would prevent Penske from planning its business over the next several years while issues are arbitrated.

In response to these claims of irreparable harm, Central States contends that Penske's relationship with Local 745 has been resilient despite contentious negotiations and strike threats. As evidence, Central States points to a September 9, 2021 Memorandum by Peter Kraft in which Kraft explains that Local 745's Taylor threatened to strike in February 2021, but that a strike ultimately did not occur. (Def.'s Resp., Ex. Q, Kraft Memo at 17–18, Dkt. No. 49.) According to Kraft's memorandum, negotiations later commenced again in 2021. (*Id.* at 18.) Central States also submits evidence suggesting that Penske is not truly concerned about a strike threat given that it has continued to push for a short-term agreement and to split Local 745 into two units over Local 745's objections. (*Id.*)

Central States also focuses on Penske not having denied that it planned to execute a complete withdrawal by lining up the expiration of its agreement with Local 745 to coincide with the expirations of its other collective bargaining agreements. According to Central States, this weighs against any finding of irreparable harm to Penske.

Having considered the totality of the record, the Court finds that Penske has made a sufficient showing of both irreparable harm and the lack of an adequate remedy at law. The risk to Penske's delicate relationship with Local 745, as demonstrated by the history of protected negotiations and strike threats between the two, represents a potential irreparable harm to Penske's business and employment relationships for which there is unlikely to be an adequate remedy at law. Though Local 745 has made no particular strike threat recently, the record supports that Local 745 continues to hold Penske responsible for the consequences that may come as a result of expulsion. (Pl.'s Mem. of Law, Ex. R(9), Oct. 5, 2021 Letter from Local 745 to Penske at 216, Dkt. No. 44-19 ("Local 745 does not understand why our members would be affected because of other Locals' negotiations with Penske.").) Further, Local 745's previous threat to strike nationally raises the stakes of the potential harm to Penske. (*See* (Pl.'s Mem. of Law, Ex. Y, Notes from Feb. 26, 2021 Call with B. Taylor at 8.)

### III. Balance of Harms

As the Court's decision hinges on Penske's inability to show a likelihood of success on the merits, the Court need not move past the threshold analysis to consider the balance of harms. For the sake of thoroughness, however, the Court addresses the parties' claims and evidence regarding the harms they would suffer as a result of, or in the absence of, a preliminary injunction.

When balancing the harms each party may suffer, courts in this Circuit apply a sliding scale approach: "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Kraft Foods*, 735 F.3d at 741 (internal quotation marks omitted). The sliding scale approach "is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the

competing considerations and mold appropriate relief." *Ty*, 237 F.3d at 896 (internal quotation marks omitted).

As with the Court's decision granting the TRO, the Court finds at the preliminary injunction stage that the balance of potential harms weighs in favor of Penske. Though Central States has suggested that it would suffer harm as a result of a preliminary injunction being entered, and accordingly has requested a bond of $150,000,000, Central States has not sufficiently explained how it would be harmed nor has it demonstrated how it calculated such a large bond amount.

The Court may also consider the harm to third parties and public policy concerns as part of its balancing analysis. *See Urb. One, Inc. v. Tucci*, No. 17 C 7892, 2018 WL 4714847, at *24 (N.D. Ill. Sept. 30, 2018) ("As the last step of the preliminary injunction analysis, the Court must balance the irreparable harms with the public interest, including the impact of granting or denying a preliminary injunction on nonparties to the litigation.") As in its TRO briefing, Penske contends that 19 of its employees who are members of Local 745 currently risk the loss of earned but unvested benefits. (Pl.'s Mem. of Law, Ex. BB, Employee List at 19, Dkt. No. 45.) Though Central States presents some evidence that those 19 employees' benefits may still vest (*see* Def.'s Resp., Ex. A, Sprau Decl. ¶ 17–18 (relaying Section 1.34 of the Fund's Plan document's description of how a Fund participant becomes a "Vested Participant")), the Court considers the fate of the benefits to be, at best, uncertain. Accordingly, the concern of harm to third parties remains.

In sum, the Court remains persuaded that the balance of harms weighs in favor of Penske. But, of course, Penske still has not satisfied the threshold requirement of a "strong showing" of

success on the merits required for issuance of a preliminary injunction. *Ill. Republican Party*, 973 F.3d at 763. Without such a showing, a preliminary injunction cannot issue.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for a preliminary injunction (Dkt. No. 43) is denied. The temporary restraining order entered on December 24, 2021 is vacated.

ENTERED:

Dated:  April 6, 2022

_____
Andrea R. Wood
United States District Judge