**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PENSKE TRUCK LEASING CO., L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 21-cv-05518 |
| | ) | |
| CENTRAL STATES, SOUTHEAST & | ) | Judge Andrea R. Wood |
| SOUTHWEST AREAS PENSION | ) | |
| PLAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Penske Truck Leasing Co., L.P. ("Penske") brought this action in Fall 2021 to

prevent Defendants Central States, Southeast & Southwest Areas Pension Plan and its Trustees

(together, "Central States" or "the Fund") from expelling Penske's Dallas, Texas employee

bargaining unit, General Drivers, Warehousemen and Helpers Local Union No. 745 ("Local

745"). After the Trustees voted to expel Local 745, the Court initially granted Penske's request

for a temporary restraining order ("TRO") enjoining the expulsion from taking effect but later

denied its motion for a preliminary injunction. Central States filed counterclaims against Penske,

seeking an award of attorneys' fees and costs incurred in this case and a declaration that Penske's

obligations to contribute to the Fund on behalf of Local 745 ceased on December 25, 2021.

Three motions are now before the Court: first, Penske asks the Court to strike Count II of Central

States's amended counterclaim (Dkt. No. 59); second, Penske seeks summary judgment in its

favor as to its claims and Central States's counterclaims (Dkt. No. 103); and third, Central States

seeks summary judgment for itself as to Penske's claims and its counterclaims (Dkt. No. 105).

For the reasons stated below, Penske's motion to strike is granted, Penske's motion for summary

judgment is denied, and Central States's motion for summary judgment is granted.

## BACKGROUND

The following facts are drawn from the parties' submissions under Local Rule 56.1.[1]

### I.    The Parties and the Trust Agreement

Penske specializes in the leasing, rental, and maintenance of over-the-road trucks and trailers nationwide. (Penske's Verified Compl. ¶ 2, Dkt. No. 1.) Central States is a multiemployer pension plan, primarily funded by employers whose collective bargaining agreements ("CBAs") with local unions require the employers to contribute to the Fund. (Penske Resp. to Central States's Statement of Facts ("PRCSSF") ¶¶ 5–6, Dkt. No. 111.) When Penske filed this action, it had ten CBAs with local employee bargaining units that required it to make contributions to the Fund. (Central States Resp. to Penske's Statement of Facts ("CSRPSF") ¶ 5, Dkt. No. 114.) At issue in this case is Penske's CBA with Local 745. (CSRPSF ¶¶ 1–2; PRCSSF ¶ 10.) In 2016, Penske and Local 745 entered into their most recent collective bargaining agreement ("2016 CBA"), which required Penske to contribute to the Fund on behalf of covered employees and expired on March 1, 2021. (CSRPSF ¶¶ 2–3, 5.)

The Fund was administered by eight Trustees—four appointed by unions and four appointed by employers or employer associations. (PRCSSF ¶ 7.) The Fund is governed by its Trust Agreement. (CSRPSF ¶ 6.) Penske was bound by the Trust Agreement and its subsequent amendments due to its Participation Agreement with Local 745, into which the two parties

---

[1] The Court notes Penske's frequent objection that certain evidence within the Administrative Record is hearsay—for example, emails or letters upon which the Trustees relied during their deliberation. When reviewing a plan administrator's decision governed by the Employee Retirement Income Security Act of 1974, however, the Court "review[s] the entire administrative record, including hearsay evidence relied upon by the administrator." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 746 n.3 (7th Cir. 2009). For this reason, "[t]he Court is not bound by the Federal Rules of Evidence when reviewing an ERISA administrator's benefits determination." *Rice v. ADP TotalSource, Inc.*, 936 F. Supp. 2d 951, 961 (N.D. Ill. 2013) (citing *Black*, 582 F.3d at 746 n.3). Thus, the Court overrules Penske's hearsay objections to the extent they would limit the Court's review of the Administrative Record.

entered in 2008. (PRCSSF ¶ 13.) The Trust Agreement includes a broad grant of authority to the

Trustees to interpret the Agreement:

> **The Trustees, by majority action, shall have the power to construe the provisions of this Agreement**, any participation agreement, the Pension Plan, any Agreement drafted by the Fund or to which the Fund is party and rules or regulations of the Pension Fund; **and any construction adopted by the Trustees in good faith shall be binding upon the Union, Employees and Employers**. The Trustees are vested with **discretionary and final authority** in construing plan documents of the Pension Fund and any other agreement, rule or regulation described in this section 17.

(Penske Statement of Facts ("PSF"), Ex. D ("Trust Agreement") Art. IV, sec. 17, Dkt. No. 106-4

(emphasis added).) The Trust Agreement also addresses the Trustees' powers with respect to

terminating participation in the Fund by employers or employer groups:

> The Trustees are authorized to reject any collective bargaining agreement, participation agreement and/or **terminate the participation of an Employer (and all Employer Contributions from the Employer) whenever they determine that the agreement is unlawful and/or inconsistent with any rule or requirement for participation by Employers in the Fund and/or that the Employer is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund** . . . **and/or they determine that continued participation by the Employer is not in the best interest of the Fund.** Any such rejection and/or termination by the Trustees of a collective bargaining agreement, participation agreement or other agreement shall be effective as of the date determined by the Trustees (which effective date may be retroactive to the initial date of the term of the rejected agreement) and shall result in **the termination of the affected group and all Employees of the Employer in the affected group from further participation in the Fund on and after such effective date.** The rejection/termination of one or more of the Employer's groups that participate in the Fund under this provision shall not affect the continued participation of any other group of the Employer that participates in the Fund.

(*Id.*, Art. IV, sec. 20 (emphasis added).) The Trustees amended this section of the Trust

Agreement in September 2021 to make clear that, consistent with "the Fund's longstanding

practice . . . the termination of one or more of an employer's groups does not trigger the

termination of all of the employer's groups that participate in the Fund." (CSRPSF ¶ 13

(alterations omitted).)

3

Under the Trust Agreement, the Trustees also serve in an adjudicatory role with respect to disputes in connection with the Fund:

> All questions or controversies, of whatsoever character, arising in any manner or between any parties or persons in connection with the Fund or the operation thereof, whether as to any claim for any benefits preferred by any participant, beneficiary, or any other person, ***or whether as to the construction of the language or meaning of the rules and regulations adopted by the Trustees or of this instrument***, or as to any writing (including a collective bargaining agreement or other Union-Employer agreement in cases where the interpretation is necessary in order to determine the application of the terms of this Agreement, a Participation Agreement, the Plan or any other Fund document or agreement to the provisions of the collective bargaining agreement or other Union-Employer agreement), decision, instrument or accounts in connection with the operation of the Trust Fund or otherwise, shall be submitted to the Trustees, or to a committee of Trustees, and ***the decision of the Trustees or of such committee thereof shall be binding*** upon all parties or persons dealing with the Fund or claiming any benefit thereunder. ***The Trustees are vested with discretionary and final authority in making all such decisions***, . . .

(Trust Agreement, Art. V, sec. 2 (emphasis added).) In the event of litigation that results in a judgment that does not "in effect invalidate[] the Trustees' rejection of the collective bargaining agreement," the Trust Agreement entitles the Fund to "a payment in the amount of the attorneys' fees and litigation costs incurred by the Trustees and/or the Fund in the courts of the litigation." (*Id.*, Art. III, sec. 6.)

## II.     Memorandum of Understanding

The 2016 CBA was set to expire on March 1, 2021. In November 2020, Penske sought a one-year extension of the 2016 CBA. (PRCSSF ¶¶ 19, 22; CSRPSF ¶ 15.) When Penske proposed the extension, a Local 745 representative reached out to the Fund for guidance on handling the request. (PRCSSF ¶ 20.) The Fund responded that any agreement less than two years in duration would be subject to review and approval by the Trustees. (*Id.* ¶ 21.) (Penske points out that all contracts required the Fund's approval, not just those under two years. (CSRPSF ¶ 16.)) Penske and Local 745 eventually agreed to a Memorandum of Understanding

4

("MOU") that would extend the terms of the 2016 CBA through March 1, 2022. (*Id.* ¶ 15.) But in December 2020, the Fund rejected the MOU, and Penske and Local 745 began negotiating a new CBA. (*Id.* ¶¶ 17–18.)

Part of the Fund's rationale for rejecting the MOU was the Trustees' fear that Penske was lining up all ten of its CBAs to expire in 2022. (PRCSSF ¶ 23.) If all of Penske's bargaining units withdrew in 2022 (rather than staggering their withdrawals over one or more years), it would trigger a single complete withdrawal liability assessment, as opposed to one or more partial withdrawal liability assessments followed by a complete withdrawal liability assessment once the final bargaining unit withdrew. (*Id.* ¶ 25.) When the Fund rejected the MOU, it noted that two of Penske's CBAs were set to expire on different dates in 2022, three expired on December 31, 2021, and four had already expired in 2020. (*Id.* ¶ 23.) Of the four that expired in 2020, three were subject to two-year extensions that expired in 2022, and the Fund's staff could not gather information about the fourth. (*Id.*) While Penske does not dispute these expiration dates, it offers a different explanation for the appearance of coordination: rather than attempting to minimize its withdrawal liability, Penske instead claims to have reacted to unusual circumstances brought on by the COVID-19 pandemic. (*Id.*)

### III.    Expulsion of Local 745

The Trustees claim that they consider several factors when deciding whether an employer or bargaining unit may continue to participate in the Fund, including seeking input from both the affected union and employer, and considering the effects of a group's termination on employees who continue working for the terminated employer. (CSRPSF ¶¶ 19–20.) The Fund also considers benefit cuts members would experience as a result of their bargaining unit's termination. (*Id.* ¶ 21.) However, Central States points out that the Trust Agreement does not

require any of those inquiries prior to an expulsion. (CSRPSF ¶¶ 19–21; Trust Agreement, Art. IV, sec. 20.)

In September 2021, the Manager of the Fund's Contracts Department informed Penske that the Fund would be meeting in mid-October to determine Local 745's continued participation in the Fund. (CSRPSF ¶ 23.) Prior to the October meeting, the Fund offered Penske a deal: the Fund's staff would recommend to the Trustees that Local 745 remain part of the Fund, so long as Penske agreed that if Local 745 withdrew in 2022, the withdrawal would be treated as a 2021 withdrawal for purposes of assessing withdrawal liability. (PRCSSF ¶ 26.) In other words, if Penske withdrew all of its bargaining units from the Fund in 2022, it would still be subject to a 2021 partial withdrawal liability assessment as to Local 745.

The October meeting's agenda presented at least two questions for the Trustees' consideration: (1) "how the Fund's rejection of the one year extension meant Penske and Local 745 needed to negotiate non-economic issues;" and (2) "why Penske did not accept their proposal that if Local 745 withdrew in 2022 it would be treated as a 2021 withdrawal for withdrawal liability purposes." (CSRPSF ¶ 26.) While Central States agrees that those issues were addressed, it contends that other factual issues existed as well. (*Id.*) The Fund explained some of its financial concerns, which primarily revolved around what it viewed as Penske's efforts to line up its CBA expirations. (PRCSSF ¶ 25.) The Fund's staff estimated that the difference to the Fund between a 2022 complete withdrawal, on the one hand, and a 2021 partial withdrawal followed by a 2022 complete withdrawal, on the other hand, would amount to tens of millions of dollars. (*Id.*)

The Trustees did not reach a decision at the October 2021 meeting, instead requesting that the Fund's staff obtain additional information, including how many employees were in each

of Penske's bargaining units and Penske's response to the proposal that a 2022 withdrawal be treated as a 2021 withdrawal. (*Id.* ¶ 30.) Penske provided additional information to the Fund, including documents and affidavits, and Penske's counsel invited the Fund to contact her with any questions. (CSRPSF ¶ 29.) Penske also provided information about its contracts with employee bargaining units in St. Louis, Missouri and Flint, Michigan. (*Id.* ¶ 30.)

At the November 2021 meeting, the Trustees again deferred a decision on the continued participation of Local 745 in the Fund. (PRCSSF ¶ 31.) The parties dispute whether the Fund's investigation into Penske continued after the meeting. (CSRPSF ¶ 37.) Specifically, while Penske states that the Administrative Record ("Record") does not reflect any ongoing investigation after November 29, 2021, the Fund contends that statements from two other unions contradicting Penske's version of events were entered into the Record after the November meeting and considered at the next meeting in December 2021. (*Id.*) Whether or not the other unions contradicted Penske, the November meeting's minutes indicate that the Fund was still attempting to contact one of the unions. (*See* PSF, Ex. M ("11/16/2021 Minutes"), at 16, Dkt. No. 108-14.)

Ultimately, on December 14, 2021, the Trustees voted to expel Local 745 from the Fund unless Penske accepted the proposal to treat a 2022 withdrawal as a 2021 withdrawal. (CSRPSF ¶ 40.) Penske declined to accept the proposal. (PRCSSF ¶ 35.) The Fund adopted four findings at the meeting: first, the Trust Agreement allowed the Fund to terminate only Local 745, as opposed to terminating all ten Penske groups; second, Penske and Local 745 were bound by the Trust Agreement's grant of discretionary authority, which allows the Trustees to terminate the participation of Local 745 and determine the date on which participation would terminate; third, the evidence indicated Penske was lining up its CBAs to expire in 2022 so as to minimize its

withdrawal liability; and fourth, even if Penske did not have plans to withdraw completely in 2022, a situation in which all of its CBAs ended in 2022 would create the opportunity to withdraw from the Fund completely, such that the Fund would be deprived of tens of millions of dollars. (*Id.* ¶ 33.)

## IV.    Procedural History

Penske filed this case on October 18, 2021, six days after the October Trustees meeting. (Dkt. No. 1.) The Complaint contains a single count seeking a declaratory judgment stating that Defendants are prohibited from partially expelling Penske (including specifically its employees represented by Local 745) from the Fund. The same day, Penske filed its motion for a TRO (Dkt. No. 6), which was quickly briefed. The parties agreed for the Court to hold its ruling in abeyance while the parties attempted to work out a resolution. (Dkt. No. 19.) But those efforts were unsuccessful, the Trustees eventually voted to expel Local 745 from the Fund, and the Court entered an order granting Penske's TRO (Dkt. Nos. 25, 26). The Court would later deny Penske's motion for a preliminary injunction, however. (Dkt. No. 72.) Meanwhile, Central States answered Penske's complaint and asserted a counterclaim for attorney's fees and costs. (Dkt. No. 33.) After Penske answered the counterclaim, Central States filed an amended counterclaim adding a second count seeking a declaration that Penske's obligation to contribute to the Fund on behalf of Local 745 ceased on December 25, 2021. (Dkt. No. 56.) The amended counterclaim was filed one day after the deadline for amendments as a matter of course under Federal Rule of Civil Procedure 15(a), and so Penske has filed a motion to strike Count II—the count added in the amendment—on grounds of untimeliness and futility. (Dkt. No. 59.) In addition to Penske's motion to strike, the parties have filed cross-motions for summary judgment. (Dkt. Nos. 103, 105.)

## DISCUSSION

### I.     Penske's Motion to Strike or, Alternatively, Dismiss Count II of the Amended Counterclaim

The Court first turns to Penske's motion to strike, or in the alternative dismiss, Count II of Central States's amended counterclaim. Penske argues that the amended counterclaim should be stricken under Federal Rule of Civil Procedure 12(f) because it was filed one court day after the deadline to file an amended pleading without Central States first obtaining Penske's written consent or leave of court. *See* Fed. R. Civ. P. 15(a)(1)(B). In the alternative, Penske argues that the amended counterclaim should be stricken as futile or dismissed because the Employee Retirement Income Security Act of 1974 ("ERISA"), specifically 29 U.S.C. § 1401(a), requires that the subject of the counterclaim be arbitrated. *See Zimmerman v. Bornick*, 25 F.4th 491, 494 (7th Cir. 2022) ("[A] court should deny leave to amend only if it is certain that amendment would be futile or otherwise unwarranted.").

### A.     Timeliness of Amendment

Central States filed its original answer and counterclaim on January 7, 2022. Penske answered the counterclaim on January 28, 2022. Under Federal Rule of Civil Procedure 15, Central States could then amend its counterclaim as a matter of course "within . . . 21 days after service of [Penske's] responsive pleading." Fed. R. Civ. P. 15(a)(1)(B). Thus, Central States could freely amend its counterclaim without obtaining Penske's written consent or leave of court until Friday, February 18, 2022. Yet Central States did not file its amended counterclaim until Tuesday, February 22, 2022. Because February 21 was Presidents' Day, a federal holiday, Central States's amendment was filed one court day past the date when it could amend as a matter of course. Central States does not dispute the timeline but responds that it simply filed its

amended counterclaim rather than seeking the leave from the Court to do so because it computed the deadline incorrectly.

Had Central States caught its computation error and sought leave to amend its counterclaim, the Court would have granted leave. Courts are to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The amended counterclaim was the first amendment of the counterclaim and was filed only one court day after the deadline for amendment as a matter of course. The amended counterclaim addresses the same general subject matter as the pleadings already filed. And Penske has not identified any prejudice it would face as a result of the timing of the amended counterclaim, such as unexplained delay or "new theories that require additional discovery." *McDaniel v. Loyola Univ. Med. Ctr.*, 317 F.R.D. 72, 77 (N.D. Ill. 2016) (internal quotation marks omitted). Accordingly, the Court declines to strike Count II of Central States's counterclaim as untimely.

Penske's alternative argument for striking Count II of the amended counterclaim rests on the futility of the claim. It is true that "futility of amendment" provides a basis to deny leave to amend. *Foman v. Davis*, 371 U.S. 178, 182 (1962). But as Penske's futility argument is essentially the same as its argument for dismissal under Federal Rule of Civil Procedure 12(b)(6), the Court sees no reason to treat it separately. The Court thus allows the amended counterclaim to stand and proceeds to consider whether it states a viable claim.

### B. Motion to Dismiss for Failure to State a Claim

Penske seeks dismissal of Count II of the amended counterclaim for lack of subject-matter jurisdiction and failure to state a claim, citing Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Despite invoking both Rules, Penske's motion to dismiss sounds more in Rule 12(b)(6) than in Rule 12(b)(1). "[S]ection 1401(a)(1) is not jurisdictional." *Rootberg v. Cent. States, Se. & Sw. Areas Pension Fund*, 856 F.2d 796, 800 (7th Cir. 1988). And other circuits

have held that "ERISA's arbitration clause is not a jurisdictional prerequisite to federal court review." *Bd. of Trs. of Constr. Laborers' Pension Tr. for S. Cal. v. M.M. Sundt Constr. Co.*, 37 F.3d 1419, 1420 (9th Cir. 1994) (agreeing with five other circuits that § 1401(a) is not jurisdictional). Since the proper challenge is not whether the Court has the power to hear this claim in the first place, but rather whether Central States states a claim for relief, the Court considers the motion to dismiss as arising under Rule 12(b)(6).

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

Count II of the amended counterclaim seeks "[a] declaration . . . that Penske's obligation to contribute to the Fund on behalf of the 745 Group ceased on December 25, 2021." (Am. Countercl. at 5 ¶ (a), Dkt. No. 56.) Penske construes Count II as seeking a determination of the date that Local 745 withdrew from the Fund and incurred liability under 29 U.S.C. § 1385(b). And because 29 U.S.C. § 1401(a) requires that "a determination made under sections 1381 through 1399 of this title . . . be resolved through arbitration," Penke contends that the counterclaim is subject to mandatory arbitration and therefore must be dismissed. In response, Central States argues that it does not seek a determination of the date of withdrawal but instead seeks a determination of the date on which Penske's obligations on behalf of Local 745 ceased.

Central States contends that this is a legally distinct determination that removes the case from § 1401(a)'s arbitration requirement. *See Cent. States, Se. & Sw. Areas Pension Fund v. Metcalf Moving & Storage Co.*, No. 95 CV 7148, 1996 WL 341405, at *3 (N.D. Ill. June 18, 1996) (agreeing with the pension funds contention that "contributions and withdrawal liability issues are, as a matter of law, separate and distinct.")

The Court is unpersuaded by Central States's careful wordsmithing. True, Central States styles its counterclaim as seeking a determination as to the date when Penske's obligations ceased, but "[n]o amount of artful pleading should be able to recharacterize the relief [Central States] truly seek[s]." *Cent. States, Se. & Sw. Areas Pension Fund v. Rail Terminal Servs. LLC*, Case No. 18 C 2372, 2019 WL 2326002, at *3 (N.D. Ill. May 31, 2019). *Rail Terminal* is informative here. In that case, the employer and the union agreed, in a letter signed March 31, 2017, to stop participating in the fund contingent on ratifying a new CBA. *Id.* at *2. The union's members voted to ratify a new CBA in April 2017, the fund received the signed letter in May, and the CBA became fully executed in June. *Id.* But the fund told the employer that, due to insufficient notice, its obligations would continue until March 2018; the fund then sued, "purport[ing] to proceed under a theory of delinquent and unpaid contributions." *Id.* at *3. The court found that the fund's claims, although "styled as seeking delinquent contribution claims . . . would make it inescapable that the [c]ourt would have to determine whether and when [the defendant] withdrew from the pension fund." *Id.* The same is true here. While Central States styles its counterclaim as seeking confirmation that Penske's obligations stopped on a certain date, doing so would necessarily require determining when Local 745 withdrew from the Fund. Indeed, in *Metcalf Moving & Storage Co.*, on which Central States relies, while the district court did note that contribution and withdrawal liability are separate issues, it went on to find that

because there was "no practical difference between the disputes," arbitration was required. *Metcalf Moving*, 1996 WL 341405, at *3.

Central States also argues that it has not made a determination regarding withdrawal liability, so the arbitration requirement has not been triggered. 29 U.S.C. § 1401(a) (requiring arbitration "concerning a ***determination*** made under sections 1381 through 1399 of this title" (emphasis added)). In effect, Central States asks this Court to make the withdrawal liability determination for it, and then, presumably, the consequences of that decision can be taken up in arbitration. But "[e]ven the seemingly innocent threshold proposition of determining whether [an employer] withdrew from the Fund[] would be improper." *Rail Terminal*, 2019 WL 2326002, at *3 (citing *Tsareff v. ManWeb Servs., Inc.*, 794 F.3d 841, 849–50 (7th Cir. 2015)). The Fund has expelled Penske. The question posed by Count II of the Fund's counterclaim is when that expulsion took effect. That issue falls squarely within § 1401(a)'s arbitration requirement. Accordingly, Count II of Central States's amended counterclaim is dismissed.

Central States raises one final argument touching on the Court's jurisdiction. It contends that if Count II is dismissed in favor of arbitration, the Court should dismiss Penske's complaint as well because the complaint is simply a mirror image of Count II. Not so. Unlike Central States, Penske does not seek a determination of the date of withdrawal or any other question of withdrawal liability—which, as discussed above, is a matter that belongs in arbitration. Rather, Penske seeks adjudication of issues involving the limits of the Trustees' power under the Trust Agreement and challenges their exercise of authority. The claims are simply not mirror images. Satisfied that it has jurisdiction over the remaining claims, the Court proceeds to the parties' motions for summary judgment.

## II.    Motions for Summary Judgment

When considering a summary judgment motion, the Court must determine if a genuine issue of material fact exists such that a reasonable jury could return a verdict for the nonmoving party. *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010). The party moving for summary judgment bears the burden of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). Once a properly supported motion for summary judgment is made, the opposing party must respond by setting forth specific facts showing that there is a genuine factual issue for trial. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). In deciding whether there is a genuine issue, the Court must "construe all facts and reasonable inferences" in the light most favorable to the nonmovant. *Nischen v. Stratosphere Quality, LLC*, 865 F.3d 922, 928 (7th Cir. 2017). "The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment." *Blow v. Bijora, Inc.*, 855 F.3d 793, 197 (7th Cir. 2017). Courts take "the facts in the light most favorable to the non-movant, first for one side and then for the other." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003).

### A.    Penske's Motion for Summary Judgment

The Court first considers Penske's arguments for summary judgment in its favor, many of which were considered and resolved in Central States's favor when the Court denied Penske's request for a preliminary injunction. Now, at the summary judgment stage, Penske's argument revolves around its contention that "[t]he Court's April 2022 decision . . . was based on a misreading of the applicable law and a misunderstanding of key facts." (Penske's Mot. for

Summ. J. at 1, Dkt. No. 104.) Penske principally contends that the Court applied the wrong standard of review to the Trustees' decision. Central States responds by first invoking the doctrine of law of the case to argue that the preliminary injunction ruling controls before going on to argue the merits of its position.

### 1. Law of the Case

The doctrine of law of the case holds that, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (internal quotation marks omitted). The doctrine "promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues." *Id.* (internal quotation marks omitted). But here, the ruling to which Central States seeks to apply the doctrine is an order deciding a motion for a preliminary injunction; such rulings "are preliminary by nature and do not normally preclude parties from relitigating issues later in the case." *SFG, Inc. v. Musk*, No. 19 C 2198, 2020 WL 1646632, at *2 (N.D. Ill. Feb. 4, 2020) (citing *In re Oil Spill by Amoco Cadiz*, 954 F.2d 1279, 1292 (7th Cir. 1992)); *Nomanbhoy Fam. Ltd. P'ship v. McDonald's Corp.*, 579 F. Supp. 2d 1071, 1091–92 (N.D. Ill. 2008)).

Central States cites *Tully v. Okeson*, 12-cv-1271-JPH-DLP, 2022 WL 4552513 (S.D. Ind. Sept. 29, 2022), for the proposition that the law of the case doctrine applies to legal conclusions at the preliminary injunction stage. *See id.* at *4. But *Tully* relied on a Seventh Circuit case concerning a different issue: whether a district court has "'authority to revisit' issues resolved in an appeal from a ruling on a motion for preliminary injunction." *Id.* (quoting *Pearson v. Edgar*, 153 F.3d 397, 405 (7th Cir. 1998)). The out-of-circuit cases on which *Tully* relies stand for the same principle: legal rulings made by a court of appeals at the preliminary injunction stage remain binding on the district court. *See, e.g.*, *Fish v. Schwab*, 957 F.3d 1105, 1141 (10th Cir.

2020) ("[B]ecuase the *Fish I* panel was able to consider the issue fully and issue a lengthy opinion discussing pure issues of law, we conclude that the law-of-the-case doctrine applies to *Fish I*'s legal conclusions."); *Ranchers Cattleman Action Legal Fund v. U.S. Dep't of Ag.*, 499 F.3d 1108, 1114 (9th Cir. 2007) ("Any of our conclusions on pure issues of law, however, are binding."). Here, in contrast, there is no Seventh Circuit ruling on any issue of law involved in this case.

Rather than acting as a hard limit on a court's power, "[t]he law of the case doctrine is a flexible rule, which 'merely expresses the practice of courts to generally refuse to reopen what has been decided.'" *Monfils v. Taylor*, 165 F.3d 511, 520 (7th Cir. 1998) (quoting *Messinger v. Anderson*, 225 U.S. 436, 444 (1912)). And it "seldom, if ever, applies to rulings on application for pretrial injunctive relief." *Nomanbhoy*, 579 F. Supp. 2d at 1092 (citing *Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C. Cir. 1974)). For that reason, the Court declines to apply the law of the case doctrine.

### 2.     Merits of Penske's Arguments

Broadly speaking, Penske raises three arguments that it contends entitle it to summary judgment on its claim: that under the standard of review it urges the Court to apply, Central States lacked authority to expel Local 745 and its decision to do so was arbitrary and capricious; that the Trust Agreement violates 29 U.S.C. § 1394(b); and that the Fund's expulsion of Local 745 forces Penske to violate the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.* The Court considered each in turn.

### a.     Standard of Review

Penske argues that the Court applied the wrong standard of review in its preliminary injunction ruling. According to Penske, the Court should have performed a two-step review: first

16

applying *de novo* review to determine whether the Trustees had the power to expel Local 745 under the Trust Agreement; and second, if the Trustees had that power to do so, applying the more deferential arbitrary and capricious standard to evaluate the Trustees' substantive decision.

### i.    Review of the Trust Agreement

Contrary to Penske's argument, at the preliminary injunction stage, the Court did apply a *de novo* standard of review "[t]o determine whether a plan gives discretion to its trustees." (4/6/2022 Order at 8, Dkt. No. 72.) Looking to two provisions of the Trust Agreement—Article IV, section 17 and Article V, section 2[2]—the Court held that the Trust Agreement "grants broad discretion to the Trustees with respect to the interpretation of and decision made pursuant to the Trust Agreement." (*Id.*) Given that broad discretion, the Court went on to apply the arbitrary and capricious standard "even to the Trustees' interpretation of the limits of [] their authority under the Trust Agreement." (*Id.* at 9.)

Penske's objection to the Court's approach is that it did not apply *de novo* review to the extent Penske wanted. Not only should *de novo* review apply to the review of the Trustees' scope of authority, Penske contends, but *de novo* review should also apply to the more substantive question of whether "the Trust Agreement permits expulsion of Penske's Local 745 bargaining unit." (Penske Mot. at 9.)

The cases cited by Penske do not support its argument, however. Penske points to three cases it contends the Court misapplied at the preliminary injunction stage, but it selectively reads each one. For example, Penske claims that the Court improperly relied on a case that did not

---

[2] In finding that the Trust Agreement "grants broad discretion to the Trustees with respect to the interpretation of and decisions made pursuant to the Trust Agreement," (4/6/2022 Order at 8), the Court quoted Article IV, section 17, but cited section 20. To clarify, section 17 grants the Trustees "power to construe the provisions of this Agreement," (Trust Agreement, Art. IV, sec. 17), and section 20 grants them the power to expel a bargaining unit (*id.*, Art. IV, sec. 20).

substantively discuss the *de novo* standard of review. *See Exbom v. Cent. States, Se. & Sw. Areas Health & Pension Fund*, 900 F.2d 1138 (7th Cir. 1990). Penske ignores that the *Exbom* court declined to discuss the *de novo* step in depth because "Article IV, Section 17 of the Trust Agreement gives the Trustees power to construe the provisions of the Agreement and the Plan, and also states that any construction adopted by the Trustees in good faith is binding." *Id.* at 1141. The present case involves a similar grant of discretion. Moreover, *Exbom* does discuss when the application of a *de novo* standard to the substance of the trustees' decision-making is appropriate. Citing a then-recent Supreme Court decision addressing a denial of benefits under 29 U.S.C. § 1132(a)(1)(B), a different provision of ERISA, the Seventh Circuit noted that such a denial "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Exbom*, 900 F.2d at 1141 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). The *Exbom* court found that *de novo* review of the trustees' challenged actions was "not for this case," because the Trust Agreement "entrust[ed] the Trustees with discretionary authority to determine both [the plaintiff's] eligibility for benefits and the proper construction of the Plan's terms," leaving "the Trustees's decision under the 'unless' clause of the *Firestone* standard." *Id.* In other words, *Exbom* discusses the *de novo* standard; Penske just disagrees with its discussion.

Similarly, in *Bator v. District Council 4*, 972 F.3d 924 (7th Cir. 2020), the Seventh Circuit applied the same type of review as did this Court in its preliminary injunction ruling. In *Bator*, the Seventh Circuit considered *de novo* whether a plan's language "conferred a plan administrator with broad interpretive discretion." *Id.* at 929. Finding that the plan did, the Seventh Circuit then applied arbitrary and capricious review to the substantive decision the plan

18

administrator made. *Id.* at 929–31. The *Bator* plan "unambiguously state[d] that the Trustees have discretion to interpret its terms by specifying the Trustees 'shall have the discretionary authority to construe the terms.'" *Id.* at 929. The same is true here, where the Trustees "have the power to construe the provisions of this Agreement." (Trust Agreement, Art. IV, sec. 17.)

Penske points to no authority in which a plan granted such discretion to the Trustees but a court reviewed the exercise of that discretion *de novo*. In the one case Penske cites where a court applied *de novo* review to the full decision, the Seventh Circuit expressly stated that the trustees **did not** have discretionary authority to construe the plan. *See Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 640 (7th Cir. 2005) (finding that *de novo* review applied where a plan administrator "is to make a judgment within the confines of pre-set standards," rather than having "the latitude to shape the application, interpretation, and content of the rules in each case"). In other words, where a plan sets clear confines, a court may review *de novo* whether a decision stayed within the boundaries. But where a plan allows its trustees to set the confines on a case-by-case basis, the court first confirms whether the plan in fact does so and then determines whether the confines set were arbitrary and capricious.

In sum, the proper standard of review is the same as applied in the Court's preliminary injunction ruling. "To decide whether a plan confers discretion on the administrator . . . [the Court] review[s] the language of the plan *de novo* as [it] would review the language of any contract." *Diaz*, 424 F.3d at 637. The Seventh Circuit in *Diaz* went on to explain that the surest way to avoid plenary review of decisions "is by including language that either mimics or is functionally equivalent to the 'safe harbor' language we have suggested: Benefits under this plan will be paid only if the plan administrator decided in his discretion that the applicant is entitled to them." *Id.* (internal quotation marks omitted). The Trust Agreement here includes similar

language: "The Trustees are vested with discretionary and final authority in making all such

decisions . . . including Trustee decisions construing plan documents of the Pension Fund."

(Trust Agreement, Art. V, sec. 2.) Moreover, the Trustees "shall have the power to construe the

provisions of this Agreement," and "are vested with discretionary and final authority in

construing plan documents of the Pension Fund and any other agreement, rule or regulation

described in this section 17." (*Id.*, Art. IV, sec. 17.) Thus, *de novo* review of the Trust Agreement

confirms that the Court's standard of review was correct. The Trust Agreement vests

discretionary authority in the Trustees.

> ii.      *Decision to Expel Local 745*

Next, Penske argues that because there was no CBA or other agreement before the

Trustees, they lacked authority to expel Local 745. According to Penske, the Trustees could do

one of two things: (i) reject an agreement between Local 745 and Penske, or (ii) expel all ten of

Penske's bargaining units. This argument again mirrors one raised and rejected at the preliminary

injunction stage.

In light of the discussion above, the Court applies an arbitrary and capricious standard of

review to the Fund's decision to expel the single bargaining unit. Under that standard, the

Trustees' decision will be upheld if:

> (1) it is possible to offer a reasoned explanation, based on the evidence, for a
> particular outcome, (2) the decision is based on a reasonable explanation of relevant
> plan documents, or (3) the administrator has based its decision on a consideration
> of the relevant factors that encompass the important aspects of the problem.

*Cerentano v. UMWA Health & Ret. Funds*, 735 F.3d 976, 981 (7th Cir. 2013) (internal quotation

marks omitted). The Trustees must give specific reasons for their decisions, but not "the

reasoning behind the reasons;" and they need only state the reason, not "why it is a ***good*** reason."

*Gallo v. Amoco Corp.*, 102 F.3d 918, 922–23 (7th Cir. 1996).

Before reviewing the Trustees' expulsion of Local 745 to determine whether it was arbitrary and capricious, the Court dispenses with Central States's argument that the Court should not reach the merits of the single-unit expulsion question because Penske, which filed its verified complaint before Local 745 had been expelled, never amended its complaint to challenge that particular action. The Court finds that it was not necessary for Penske to amend its complaint because it directly raised the issue of single-unit expulsion from the beginning. Indeed, Penske initially sought injunctive relief to prevent the Fund from "ejecting Penske's Local 745 bargaining group from the Fund" or otherwise "taking any action that would create a partial withdrawal." (Compl. at ¶ (a), p. 18, Dkt. No. 1.) Accordingly, Penske is not "rais[ing] new theories or claims for the first time" at the summary judgment stage. *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 479 (7th Cir. 2019).

But that does not save Penske's argument, which hinges entirely on application of *de novo* review to conclude that only an employer as a whole may be expelled. In its reply brief, Penske argues that the Court may only apply an arbitrary and capricious standard if it determines *de novo* that the Trustees had the authority to expel a single unit. But the Court need not do so, because the Trust Agreement expressly grants interpretation of the Trust Agreement to the Trustees. As such, the question is not whether a fresh look at the Trust Agreement's language reveals an incorrect interpretation by the Trustees. Rather, it is whether the Trustees' interpretation is within the "range of reasonable interpretations." *Green v. UPS Health & Welfare Package for Retired Emps.*, 595 F.3d 734, 738 (7th Cir. 2010). This does not mean that the Court will simply rubber-stamp the Fund's decision. Instead, arbitrary and capricious review necessitates a focus on "procedural regularity, substantive merit, and faithful execution of fiduciary duties." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 & n.5 (7th Cir. 2010).

While not the model of clarity, Article IV, Section 20 can reasonably be interpreted as allowing the Trustees to terminate an affected group of an employer and not just the employer as a whole. True, the beginning of the provision discusses the Trustees' right to "terminate the participation of **an Employer** . . . whenever . . . they determine that continued participation by **the Employer** is not in the best interest of the Fund." (Trust Agreement, Art. IV, sec. 20 (emphasis added)). But the provision goes on to state that a termination "shall result in the termination of the affected group," such that "[t]he rejection/termination of one or more of the Employer's groups that participate in the Fund under this provision shall not affect the continued participation of any other group of the Employer that participates in the Fund." (*Id.*) This portion of the provision clearly envisions single-group expulsion, even when an employer has multiple groups that participate in the Fund. Even if the clause is ambiguous, the Trustees have "discretionary **and final** authority in construing plan documents." (*Id.*, Art. IV, sec. 17 (emphasis added).)  And the Fund's interpretation of the provision is within the "range of reasonable expectations." *Green*, 595 F.3d at 738.

Accordingly, the Court finds that the Trustees' decision to expel only Local 745, and not Penske as a whole, is a reasonable interpretation of the Trust Agreement and passes muster under arbitrary and capricious review.

### iii.    Conflict of Interest

Penske also argues that the Trustees' decision-making process was marred by a conflict of interest. Indeed, a trustee's conflict of interest is "one of the factors that must be taken into account in applying [the arbitrary and capricious] standard." *P-Americas, LLC v. Cent. States, Se. & Sw. Areas Pension Fund*, No. 13 C 8808, 2014 WL 3858396, at *5 (N.D. Ill. Aug. 5, 2014)

(quoting *Fischer v. Liberty Life Assur. Co. of Bos.*, 576 F.3d 369, 376 (7th Cir. 2009)). But no reasonable factfinder could conclude that the Fund had a conflict of interest here.

The Fund "owe[s] a duty to the beneficiaries, not the employers." *Cent. States, Se. & Sw. Areas Pension Fund v. Waste Mgmt. of Mich., Inc.*, 268 F.R.D. 312, 318 (N.D. Ill. 2010) (citing *NLRB v. Amax Coal Co.*, 453 U.S. 322, 334 (1981)); *see also* 29 U.S.C. § 1104(a) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries."). And Penske is not a beneficiary of the Fund. In its reply, Penske frames the alleged conflict as not between the Fund and itself, but as between the Fund and Local 745's members, who are beneficiaries of the Fund. Any time a bargaining unit or employer is expelled from the Fund, the Fund gains money in the form of withdrawal liability and the employees lose out on the Fund's benefits. Thus, Penske suggests that every expulsion decision is necessarily conflicted and warrants heightened arbitrary and capricious review.

While there are no "talismanic words" that indicate a conflict of interest, the Supreme Court has provided guidance regarding certain circumstances weighing in favor of finding a conflict, such as "cases where an insurance company administrator has a history of biased claims administration," and others weighing against a conflict, including where "the administrator has taken active steps to reduce potential bias and to promote accuracy." *Metro. Life Ins. Co. v. Glenn*, 544 U.S. 105, 117 (2008).

Penske has pointed to no history of bias. As evidence that a purported financial conflict affected the Trustees' decision, Penske points to the September 2021 amendment of the Trust Agreement to expressly permit expulsion of a single unit and the Fund's purported failure to follow its own procedures. But the amendment was well within the scope of the powers granted to the Trustees by the Trust Agreement. (Trust Agreement, Art. X.) Penske also argues that the

Trustees failed to follow their normal procedures in expelling a single bargaining unit. But, as explained below, Penske has not demonstrated that the Trustees failed to follow normal procedures. Sour grapes is not a basis to find that the Fund was conflicted, and the Court does not so find here. Absent any conflict, regular arbitrary and capricious review applies. *See P-Americas*, 2014 WL 3858396, at \*6 (citing *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006)).

### b. Whether the Decision was Arbitrary and Capricious

Penske advances four arguments in support of its argument that the decision to expel Local 745 was arbitrary and capricious: (1) that the Trustees did not act for a permissible reason and are instead raising an improper *post hoc* rationale; (2) the Fund did not follow its own process; (3) the Fund penalized Penske for not answering questions it never actually posed to Penske; and (4) the Trustees misrepresented the status of their process.

### i. Post Hoc *Rationale*

Penske contends that the Trust Agreement provides no basis for Local 745's expulsion and that any reasoning Central States offers now is nothing more than a *post hoc* rationalization. But while Penske suggests that the record is devoid of any reason for Local 745's withdrawal, the Trustees did provide reasons for their decision. Specifically, they "concluded that it appeared that Penske was attempting to line up the expiration dates of the CBAs covering Penske's ten groups that participate in the Pension Fund for negotiations in 2022 which could result in a complete withdrawal by Penske from the Pension Fund in 2022." (Central States' Statement of Facts, Ex. F ("Record") at 2–3, Dkt. No. 106-6.) The Trustees found that Penske was aware of its withdrawal liability and had "requested annual complete withdrawal liability estimates since 2014," which the Trustees took as evidence that Penske was aligning its CBAs. (*Id.* at 6.) They

24

also saw the one-year extension that Penske proposed to Local 745 as further evidence that it was lining up the CBAs. (*Id.* at 2.) It is clear from the contemporaneous record that the Trustees felt Penske's machinations with Local 745 were not in the best interest of the Fund and took the most direct action: expelling the single bargaining unit.

While the Trust Agreement does provides specific reasons that justify expulsion, it also includes broader authority for the Trustees to expel an employer that is "engaged in one or more practices or arrangements that threaten to cause economic harm to . . . the fund." (Trust Agreement, Art. IV, sec. 20.) While this language discusses expulsion of an Employer, for the reasons discussed above, the Court finds it reasonable that the Trustees would choose to expel only the single bargaining unit in light of the language found at the end of Article IV, section 20. Looking only to the contemporaneous record, then, the Court finds that the Trustees' decision was "based 'on a consideration of the relevant factors that encompass the important aspects of the problem.'" *Carlson v. Northrop Grumman Corp.*, 333 F.R.D. 415, 421 (N.D. Ill. 2019) (quoting *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008)). In short, the contemporaneous record provides sufficient justification for the Fund's decision.

*ii.      Process*

Next, Penske argues that the Trustees abandoned their own process by not considering the effects on the participants of terminating Local 745.

"[A] number of courts have concluded that *de novo* review is appropriate when the administrator fails to abide by the procedural protections provided for in the Plan or ERISA." *Est. of Malecki v. Anheuser-Busch Deferred Income, Stock Purchase & Sav. Plan*, No. 10 C 5072, 2012 WL 2049457, at *8 (N.D. Ill. June 5, 2012) (collecting cases). As evidence that the Trustees were required to consider the effects on participants of terminating Local 745, Penske

points to interrogatory responses in which the Fund states that it "recognize[d] that the termination of a group will impact the future benefit accruals of employees who continue to work for a terminated employer and do not seek employment with another participating employer, and the Trustees consider these effects of termination in making their decision," (CSRPSF ¶ 20), as well as "potential benefit cuts that a member would receive as a result of a termination of participation in the Plan" (*id.* ¶ 21). Because the contemporaneous record does not include analysis to this effect, Penske argues, the Fund's decision is arbitrary and capricious.

In response, the Fund argues that its consideration of the impact of a termination on beneficiaries is not an individual-specific inquiry; rather, it considers the general fact that termination means employees no longer accrue benefits with the Fund. (Penske's Response to Central States' Statement of Add'l Facts ("PRCSSAF") ¶ 11, Dkt. No. 118.) And the Record shows that the Fund considered this effect. (*See* Record at 2 ("Contributions are currently paid on 33 employees in the Local 745 group.").) Penske has not identified any procedures required by the Trust Agreement or ERISA that the Fund failed to follow. Statements in interrogatory responses that its process involved considering certain factors is not the same thing as being required to follow specific procedural safeguards set out in the Plan or ERISA. As the Court held at the preliminary injunction stage, the Trustees' broad discretion "includes the Trustees deciding when and how to take into account the effect of expulsion on Fund participants." (4/6/2022 Order at 16.) Penske has provided no reason for this Court to alter its prior analysis or conclusion. The Fund did not procedurally err such that its decision was arbitrary and capricious.

### iii. Refusal to Question Penske

Penske's next argument—that the Fund's decision was arbitrary and capricious because the Trustees identified questions for Penske but declined to ask them—again revisits the Court's

preliminary injunction ruling. At bottom, Penske argues that the Trustees skimped on their investigation.

ERISA demands a reasonable inquiry but "does not require a full-blown investigation." *O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 961 (7th Cir. 2001) (internal quotation marks omitted); *see also Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 213 (2d Cir. 2015) ("[N]othing requires plan administrators to scour the countryside in search of evidence to bolster a petitioner's case." (internal quotation marks and alterations omitted)). And the Trust Agreement only requires that the Trustees find that Local 745's continued participation is not in the Fund's best interest; it does not require specific factual findings that lead to a particular conclusion. (Trust Agreement, Art. IV, sec. 20.)

The Trustees found that, among other things, Penske's apparent lining-up of CBAs threatened the Fund. Penske was well aware of this worry and was unable to ameliorate it. The Trustees invited Penske to submit whatever information Penske felt the Trustees should have in making their decision, and Penske accepted that offer. The Trustees were not required to adduce Penske's evidence on its behalf. *Rubber Shop v. Benicorp Ins. Co.*, 238 F.R.D. 618, 622–23 (N.D. Ind. 2006) (collecting cases). The Trustees had sufficient information to base their decision "on a consideration of the relevant factors that encompass the important aspects of the problem." *Carlson*, 333 F.R.D. at 421 (quoting *Speciale*, 538 F.3d at 621). Accordingly, the Trustee's decision not to ask Penske specific questions does not render their process arbitrary and capricious.

*iv.*      *Misrepresentation of Status of Investigation*

Finally, Penske argues that the Trustees misrepresented the status of their investigation. Specifically, the Fund told the Court on November 29, 2021, that the Fund was "sort of still

27

investigating and looking into some facts surrounding the matter." (CSRPSF ¶ 36.) Yet the Record does not reflect any investigation by the Trustees after that point in time. According to Penske, this demonstrates that the Trustees' process was arbitrary and capricious because despite claims that they were conducting a real inquiry, in fact, there was no information Penske could have provided to save Local 745—Penske's only option was to accept the proposal to treat a 2022 withdrawal as a 2021 withdrawal. Penske concedes that this purported "discrepancy . . . does not pertain to the reasoning for the decision," but contends that it nonetheless "reflect[s] a questionable process." (Penske's Mot. for Summ. J. at 30.)

Yet Penske also admits that there are statements in the Record by other unions that were received after the November 2021 Trustees' meeting. (PRCSSAF ¶ 21.) This suggests there was some form of investigation ongoing. Indeed, that is precisely what the Fund represented to the Court on November 29: that it "hadn't gotten responses from these locals by the time of the November 16th meeting." (PRCSSAF ¶ 30.) Penske has not established that the Fund misrepresented the status of anything, let alone identified any misrepresentations so egregious that they warrant finding the process (or the decision) arbitrary and capricious.

In sum, no reasonable factfinder could agree with Penske that the Fund's process was arbitrary and capricious.

### c.    29 U.S.C. § 1394(b)

Penske next argues that the Trust Agreement violates 29 U.S.C. § 1394(b). That statutory provision reads:

> All plan rules and amendments authorized under this part ***shall operate and be applied uniformly with respect to each employer***, except that special provisions may be made to take into account the creditworthiness of an employer. The plan sponsor shall give notice to all employers who have an obligation to contribute under the plan and to all employee organizations representing employees covered under the plan of any plan rules or amendments adopted pursuant to this section.

28

29 U.S.C. § 1394(b) (emphasis added). ERISA requires that a plan be administered "insofar as [the plan's] documents and instruments are consistent with the provisions of" Title I and Title IV of ERISA. 29 U.S.C. § 1104(a)(1)(D). If the Trust Agreement violates § 1394(b), then it cannot be administered by the Trustees.

Penske focuses on the Court's conclusion that the Trust Agreement permits the expulsion of a single bargaining unit. If that is the case, Penske contends, then the Trust Agreement does not treat each employer uniformly because some employers only have a single bargaining unit for which they make contributions to the Fund while others have multiple. Expulsion of a single bargaining unit subjects single-unit employers to a complete withdrawal but multi-unit employers to a partial withdrawal. Penske likens the difference in treatment of single-unit employers and multi-unit employers to disparate impact claims in an employment discrimination context; "[u]nder a disparate impact theory, an employer is held liable when a facially neutral employment practice disproportionately impacts members of a legally protected group." *Downing v. Abbott Lab'ys*, 48 F.4th 793, 815 (7th Cir. 2022) (internal quotation marks omitted).

But unlike Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., which establishes liability for employment discrimination, there is no basis in ERISA law to conclude that a neutrally-applied provision that leads to different results for different employers violates § 1394(b). Moreover, Penske focuses on the dictionary definition of "uniformly," but ignores the words "operate" or "apply." "Operate" is defined as "[t]o exercise force or influence, produce an effect; to act, work." *Operate*, Oxford Eng. Dict. https://www.oed.com/view/Entry/131741 (last visited March 28, 2025). "Apply" is defined as "to put a thing into practical contact with another." *Apply*, Oxford Eng. Dict. https://www.oed.com/view/Entry/9724 (last visited March

28, 2025). In context, those verbs indicate that § 1394(b) demands uniformity as to input, not output—that is, neutral administration of the particular plan's rules rather than equal outcomes.

The scant case law discussing § 1394(b) does not support a different approach. The First Circuit has read the uniformity requirement such that "[a]ny deviation from the original procedure to reach a result that harms the employer could well be found unreasonable if challenged." *Keith Fulton & Sons, Inc. v. New Eng. Teamsters & Trucking Indus. Pension Fund, Inc.*, 762 F.2d 1137, 1141 n.4 (1st Cir. 1985). In other words, uniformity requires that all employees be subject to the same procedure, not that they receive the same result. Addressing identical language in the Code of Federal Regulations, one district court has noted that an arbitrator properly adjusted a fund's withdrawal liability interest rate where "[t]he Arbitrator did not find a 'consistently applied' rate." *N.Y. Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund*, 303 F. Supp. 3d 236, 265 (S.D.N.Y. 2018) (citing 29 C.F.R. § 4219.33). While this case does not involve cold calculations—as most § 1394 cases do—the Court is persuaded by the Fund's argument that all employers, whether they are single-unit or multi-unit employers, are subject to the same provision—that is, Article IV, section 20.[3]

### d. Forced NLRA Violation

Finally, Penske argues that by expelling Local 745, Central States improperly forced it to violate the provision of the NLRA that required Penske to continue contributions to the Fund on behalf of Local 745 even after expiration of the 2016 CBA.

---

[3] The Fund also argues that § 1394(b) only applies to calculation of withdrawal liability. It is correct that the majority of case law relates to such calculations. But the text of the statute indicates that it applies to "[a]ll plan rules and amendments authorized under [Subtitle E, Part 1]." 29 U.S.C. § 1394(b). Absent contrary authority, the Court declines to hold that an amendment allowing expulsion does not, as a matter of law, apply to Subtitle E, Part 1. 29 U.S.C. §§ 1381–1405.

Under the NLRA, it is "an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of [its] employees." 29 U.S.C. § 158(a)(5). Courts have read this provision to mean that "an employer's failure to honor the terms and conditions of an expired collective bargaining agreement pending negotiations on a new agreement constitutes bad faith bargaining in breach of . . . the [NLRA]." *Laborers Health & Welfare Tr. Fund for N. Cal. V. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 544 (1988) (internal quotation marks omitted). Central States contends that § 158(a)(5), as interpreted by *Advanced Lightweight*, only applies to an employer's unilateral change of working conditions. If the change is beyond the employer's control, there is no NLRA violation.

In *NLRB v. Katz*, 369 U.S. 736 (1962), the Supreme Court emphasized that an employer acted unilaterally to alter the *status quo* in finding it liable for an unfair labor practice. *See id.* at 742–45. More recently, the NLRB itself found that an employer "is not permitted unilaterally to replace the benefits or to remit benefit fund contributions directly to the unit employees because doing so would be inconsistent with the statutory duty to bargain." *Cofire Paving Corp.*, 359 N.L.R.B. 180, 184 (N.L.R.B. 2012).[4] The Seventh Circuit has stated that 29 U.S.C. § 158(a)(5) is violated when "[a]n employer . . . ***unilaterally*** chang[es] conditions of employment." *Mondelez Glob. LLC v. NLRB*, 5 F.4th 759, 772 (7th Cir. 2021) (emphasis added). Other federal courts have required unilateral action by an employer before finding an unfair labor practice. *See, e.g.*, *Visiting Nurse Servs. of W. Mass., Inc. v. NLRB*, 177 F.3d 52, 57–58 (1st Cir. 1999); *Bryant & Stratton Bus. Inst., Inc. v. NLRB*, 140 F.3d 169, 182 (2d Cir. 1998). Here, no reasonable

---

[4] *Cofire* has been called into question by at least one district court due to the participation of an individual whose appointment to the NLRB was later invalidated by the Supreme Court. *See Midwest Operating Eng'rs v. Dredge*, 147 F. Supp. 3d 724, 745 n.11 (N.D. Ill. 2015) (citing *NLRB v. Noel Canning*, 573 U.S. 513 (2014)). Nevertheless, the Court views *Cofire* as supporting the general principle that it is unilateral actions that run afoul of the NLRA's duty to bargain in good faith.

factfinder could find that Penske violated the NLRA in this case because it did not unilaterally cease contributions pending a new CBA.

In arguing to the contrary, Penske attempts to distinguish the case on which the Court relied at the preliminary injunction stage, *Central States, Southeast & Southwest Areas Pension Fund v. Jones Motor Corp.*, No. 99 C 1679, 1999 WL 521163 (N.D. Ill. July 13, 1999). To recap, in *Jones*, an employer terminated by a fund argued that it could not be deemed to have withdrawn because it was required to continue to making contributions pursuant to 29 U.S.C. § 158(a)(5). The district court found, however, that

> Jones' argument fails to account for the fact that Central States terminated Jones' participation in the plan. . . . Because Jones has been expelled from Central States, it is no longer obligated to make contributions. Jones argues that its duty of good faith requires it to continue contributing to Central States. But the duty of good faith simply requires Jones to continue to honor the expired bargaining agreement.

*Id.* at *3. The district court therefore denied summary judgment in the employer's favor. *Id.* According to Penske, the present case is different because its expulsion resulted from its own actions of appearing to line up CBAs and refusing to accept the proposal to treat a 2022 withdrawal as a 2021 withdrawal. Since Penske could have prevented expulsion, Local 745 **could** argue that it engaged in an unfair labor practice.[5] But, in *Jones*, the expelled employer **also** took actions that caused Central States to expel it, thereby bearing some responsibility for the expulsion. Taken to its logical conclusion, Penske's argument would find that any expelled employer necessarily violates the NLRA because it took some action that caused the Fund to expel it. Nothing in the law warrants that conclusion. That Penske engaged in actions that the Fund saw as worthy of expulsion is not sufficient to subject Penske to liability under the NLRA.

---

[5] As Central States points out, however, Local 745 has not made such an argument and the statutory period in which it could seek NLRB review has passed.

For the above reasons, all Penske's arguments for summary judgment in its favor fail. Penske is not entitled to judgment in its favor as a matter of law as to its Complaint or, for that matter, Count I of Central States's amended counterclaim, which seeks an award of attorney's fees and costs.

### B. Central States's Arguments for Summary Judgment

The Court next turns to Central States's arguments for summary judgment in its favor. (Dkt. No. 105.) Central States's arguments in support of summary judgment largely overlap with those discussed above in opposition Penske's motion, and the Court will not repeat that analysis again. Suffice to say, the proper standard of review is for the Court to first assess the Trust Agreement *de novo* to determine whether it grants discretion to the Trustees to interpret and make decisions under the Trust Agreement. It does. The text of the Trust Agreement is clear: the Trustees have the power to interpret the agreement and, as such, each subsequent step of the Trustees' analysis and decision is subject to arbitrary and capricious review. Nothing here indicates a conflict that warrants additional consideration. The Trustees amended the Trust Agreement in accordance with its terms and did not impermissibly depart from their prescribed procedures. And the Trustees' initial determination that the Trust Agreement empowered them to expel a single bargaining unit was not arbitrary and capricious.

The same is true of the Trustees' substantive decision to act within their power to expel Local 745. While Penske points to various facts it feels the Trustees should have considered and processes it contends the Trustees should have followed, it has not pointed to any evidence from which a reasonable factfinder could conclude that the Trustees were "downright unreasonable." *Id.* ERISA demands "a 'reasonable inquiry,'" not "a 'full-blown' investigation." *Nickola v. Grp. Life Assurance Co.*, No. 03 C 8559, 2005 WL 1910905, at *11 (N.D. Ill. Aug. 5, 2005) (quoting *O'Reilly*, 272 F.3d at 961). Each of the four issues Penske raises as reasons to find the decision

arbitrary and capricious fall flat. Even if the Fund offered *post hoc* reasons before this Court, the record developed by the Trustees supports their decision. Penske has failed to point to any procedures the Trustees were required to follow that they did not. Nor is there a requirement that the Trustees affirmatively seek out information from Penske; rather, the Trustees were within their right to consider the evidence Penske offered to be insufficient. Finally, there are no facts presented from which a factfinder could conclude that the Fund misrepresented the status of its investigation, let alone to the level that would require displacing its decision. For these reasons, Central States's is entitled to summary judgment with respect to Penske's claim for declaratory relief.

That leaves Count I of the amended counterclaim, in which Central States seeks its attorneys' fees for this litigation. The Trust Agreement is straightforward on this point:

> Whenever there is litigation challenging the Trustees' exercise of their authority to reject a collective bargaining agreement, participation agreement or other agreement and/or terminate the participation of one or more of an Employer's groups and effect the termination of all Employees of the Employer in the affected group or groups from further participation in the Fund on and after an effective date determined by the Trustees, and there is related litigation to which the Trustees (or any of the Trustees) and/or the Fund and the Employer are parties (regardless of which entity or entities commenced the litigation), the Trustees and the Fund, at the conclusion of the litigation by judgment or settlement (except by a judgment that in effect invalidates the Trustees' rejection of the collective bargaining agreement, participation agreement or other agreement and/or termination of participation), ***shall be entitled to recover from the Employer a payment in the amount of the attorneys' fees and litigation costs incurred by the Trustees and/or the Fund in the course of the litigation***. . . . The duty imposed upon an Employer to pay fees and costs applies to a declaratory judgment action as well as a suit brought by an Employer that is dismissed for any reason with or without prejudice including cases dismissed for improper venue or lack of subject matter or personal jurisdiction.

(Trust Agreement, Art. III, sec. 6 (emphasis added).) Given that the Court has found in favor of the Trustees regarding the exercise of their authority to "terminate the participation of one or more of an Employer's groups" (*id.*), the Trust Agreement provides that the Trustees are entitled

to collect "a payment in the amount of the attorneys' fees and litigation costs incurred by the Trustees and/or the Fund in the course of the litigation," (*id.*).

The Federal Rules of Civil Procedure and the Local Rules of the Northern District of Illinois provide the procedures for post-judgment filing of a fee petition. *See* Fed. R. Civ. P. 54(d)(2); N.D. Ill. Local Rule 54.3. To that end, Defendants will be permitted to file a fee motion setting out their fees and litigation costs pursuant to the procedures set out in Local Rule 54.3. *See One Way Apostolic Church v. Extra Space Storage, Inc.*, No. 16 C 1132, 2019 WL 10892090, at *3–4 (N.D. Ill. Mar. 25, 2019); *Tarau v. Coltea*, No. 15-CV-03545, 2017 WL 467682, at *2 (N.D. Ill. Feb. 2, 2017).

## CONCLUSION

For the foregoing reasons, Penske's motion to strike Defendants' amended counterclaim, or, alternatively, to partially dismiss Defendants' amended counterclaim (Dkt. No. 59) is granted as to the alternative relief of dismissal. Count II of the amended counterclaim is dismissed. As for the remaining claims, Penske's motion for summary judgment (Dkt. No. 103) is denied, and Defendants' motion for summary judgment (Dkt. No. 105) is granted. Judgment will be entered in favor of Defendants.

ENTERED:

Dated:  March 31, 2025

Andrea R. Wood
United States District Judge

35